ERNEST L. BAILEY *v.* THE CHARLESTON MAIL ASSOCIATION, *a Corporation, and* WALTER E. CLARK

(CC 672)

Submitted October 5, 1943. Decided November 30, 1943.

*Howard B. Lee* and *Wm. Bruce Hoff,* for plaintiff.

*Brown, Jackson & Knight* and *Spilman, Thomas & Battle,* for defendants.

LOVINS, JUDGE:

This is an action for libel in which the Circuit Court of Kanawha County overruled plaintiff's demurrer to defendants' amended special plea of privilege and fair comment and, of its own motion, certified the ruling to this Court. The following is a resume of the pertinent facts alleged in plaintiff's declaration.

Plaintiff at and prior to the publication of the editorials hereinafter mentioned was, and is now, a member of the State Road Commission and State Road Commissioner of West Virginia. On behalf of the State of West Virginia and in the discharge of his official duties, plaintiff on or about December 26, 1941, purchased a bridge commonly known as the "Silver Bridge", which spans the Ohio River at the City of Point Pleasant.

The Charleston Mail Association owns and publishes a daily newspaper of general circulation in Kanawha and other counties of the State, known as The Charleston Daily Mail. The defendant, W. E. Clark, is president and chief executive officer of the Association and editor of the newspaper. Clark wrote the editorials declared upon, which appeared on the front pages of the "Home Edition" and "Final Edition" of the newspaper published on April 7, 1942, in a column headed "At This Hour". The two editorials have substantial dissimilarities, which are indicated in the quotations following by italics.

The editorial published in the home edition reads as follows:

"At This Hour
*"None* Silver

"Among the *abounding* scandals of the Neely administration is the one concerning the 'Silver Bridge.' This bridge, which spans the Ohio River

at Point Pleasant, was a tollway — and such bridges, in recent years, have declined greatly in public esteem. It was well-known that the owner, the West Virginia-Ohio Bridge Corporation, would like to sell the bridge. The only customer in sight, it seems, was the state of West Virginia. The state was a willing negotiator, but the state officials did not choose to deal with the bridge company direct. There would have been no 'gravy' for anybody in that. The state administration in the most accommodating way *delegated an agent to represent it in dealings* with the bridge company.

"This agent, *delegated by* the Neely Deal, is a prominent politician of Cabell county. *He is not a state office-holder. Nevertheless,* it was he who arranged the transfer of the *Pt.* Pleasant bridge property to the state of West Virginia. He first proceeded to option the bridge property in the sum of $990,000. Then he sold it to the state for $1,040,000 — a neat clean-up of $50,000. The Cabell county politician who turned this trick knows best whether he was able to keep all of *this* 'profit' for himself.

"But that was not the end of this profitable venture. The Neely Deal issued revenue bonds, on behalf of the state, to pay for the bridge. Here, then, was a sure prospect of more gravy, which *no very smart politician of the Neely Deal could* be expected to overlook. The face of the bonds was $1,040,000, but they were sold at private sale (no competitive bidding permitted) *to a bonding house whose representative in West Virginia is our same old friend, the Cabell county politician!* There are those who know, probably, just what the Cabell gentleman's 'slice' was in this transaction — we don't."

The writing as published in the final edition contained the following:

"At This Hour

"*More* Silver

"Among the *multiplying* scandals of the Neely administration is the one concerning the 'Silver Bridge.' This bridge, which spans the Ohio River

at Point Pleasant, was a tollway — and such bridges, in recent years, have declined greatly in public esteem. It was well-known that the owner, the West Virginia-Ohio Bridge corporation, would like to sell the bridge. The only customer in sight, it seems, was the state of West Virginia. The state was a willing negotiator, but the state officials did not choose to deal with the bridge company direct. There would have been no 'gravy' for anybody in that. The state administration in the most accommodating way *dealt with an agent in the transaction* with the bridge company.

"This agent, *closely related with* the Neely Deal, is a prominent politician of Cabell County, *not a state office-holder*. It was he who arranged the transfer of the *Point* Pleasant bridge property to the state of West Virginia. He first proceeded to option the bridge property in the sum of $990,-000. Then he sold it to the state for $1,040,000 — a neat clean-up of $50,000. The Cabell county politician who turned this trick knows best whether he was able to keep all of *the* 'profit' for himself.

"But that was not the end of this profitable venture. The Neely Deal issued revenue bonds, on behalf of the state, to pay for the bridge. Here, then, was a sure prospect of more gravy, which *such a smart politician of the Neely Deal could not* be expected to overlook. The face of the bonds was $1,040,000, but they were sold at private sale (no competitive bidding permitted) *and they bore 3 per cent interest — a high rate for West Virginia bonds. They were sold to a bonding house whose representative in West Virginia is our same old friend, the Cabell county politician!* There are those who know, probably, just what the Cabell gentleman's 'slice' was in this *bond* transaction — we don't."

It is further alleged that the language used in the editorials implied that plaintiff, or some officer or agent of the State, had stolen or misapplied money or property belonging to the State of West Virginia; that such officer or agent acted under plaintiff's direction or with his knowledge or approval; that plaintiff, or some other

officer or agent of the State of West Virginia, had acted corruptly in relation to the purchase of the bridge; and that plaintiff was neglectful and incompetent in the performance of his official duties.

It would unduly lengthen this opinion to state in detail the allegations of defendants' special plea of privilege and fair comment. The following suffices to set forth the issues here presented: Defendants claim that it is their right and duty to publicize and criticize the acts of officers and agents of the State, and especially those relating to the expenditure of public funds.

The owner of the bridge, a private corporation, was anxious to effect a sale thereof, its stockholders having authorized sales on two occasions in 1941, at prices. substantially less than that paid by the State. An unsuccessful attempt was made during the same year to sell the bridge to the State of Ohio. The City of Point Pleasant entered into a contract to purchase the bridge, but plaintiff, learning thereof, prevented the consummation of that sale, and from the foregoing it is alleged as a conclusion that the only available purchaser of the bridge was the State of West Virginia.

Although plaintiff knew of the desire of the owner to sell the bridge, he did not deal directly with it for the purchase thereof, but instead directed or caused the owner to employ George I. Neal as agent for the sale of the bridge to the State, or that plaintiff consented to, and approved such employment with knowledge that Neal would demand and receive a part of the purchase price. It is then alleged that in December, 1941, plaintiff Neal and Roy Nelson, the latter representing Nelson, Browning & Company, a firm of bond brokers, agreed that the State of West Virginia would purchase the "Silver Bridge" through Neal, for the sum of $1,050,000, and that revenue bonds of the State of West Virginia would be issued and sold at private sale to Nelson's principal without competitive bidding. The plea then charges that acting under such arrangement Neal was employed to sell the bridge to

the State, the bridge company agreeing to pay Neal $40,000 and to pay Nelson, Browning & Company, also alleged to be represented by Neal, an additional amount of $20,000 out of the purchase price of $1,050,000; thereafter plaintiff, as State Road Commissioner, delivered to the owner of the bridge a warrant of the State of West Virginia for $1,050,000, and that the bridge corporation at the same time as a part of the transaction delivered to Neal two drafts, one for $10,000 and one for $30,000, both of which were indorsed by the owners of the bridge to Neal's order. The owner of the bridge likewise delivered to Nelson, Browning & Company a draft for the sum of $20,000; and on the same occasion, as a part of the same transaction, plaintiff, in his official capacity as State Road Commissioner, and other representatives of the State of West Virginia, sold, privately, without advertisement or competitive bidding, and delivered to Nelson, Browning & Company revenue bonds of the State of West Virginia in the face amount of $1,050,000, bearing three per cent interest, contrary to the practice of many years standing to make such sales to the highest bidder after soliciting bids. Thereafter, for reasons unknown, bonds of face value of $10,000 were, with the knowledge and approval of plaintiff, returned by either Nelson, Browning & Company or Neal to the State of West Virginia, and by it cancelled, the purchase price of the bridge being thereby reduced to $1,040,000, and which likewise reduced the commissions of Neal and Nelson, Browning & Company to $50,000. The defendants aver that they do not know how the profit of $50,000 was divided or shared, or whether Neal received any part of the $20,000 paid to Nelson, Browning & Company. All the matters hereinabove mentioned are alleged to be true.

The plea then avers that all statements, observations or parts of the editorials, other than those in the plea alleged as facts constitute fair comment and criticism on such facts, and are inferences fairly drawn therefrom in the opinion of defendants; that such comment and criti-

cism was not for the purpose of causing harm to plaintiff, but was published without malice and in good faith upon a transaction of public concern, and that the occasion thereof was qualifiedly privileged.

The following averment appears in the plea: "Defendants further aver that if said parts, portions, observations or statements, or either or any thereof, be regarded or considered as statements of fact rather than as such comments or criticism, the same were made in good faith, without malice, upon reasonable grounds and reliable information, and in a reasonable and honest belief in the truth thereof, and were and are conditionally or qualifiedly privileged."

Defendants deny that the editorials are defamatory, malicious or insulting, and that they tended to incite violence and a breach of the peace. It is further pleaded that plaintiff unreasonably and falsely extended the meaning of the editorials by exaggerated innuendo. The plea further avers that the editorials were published for the sole purpose of giving to the readers of the paper and the people of the State information relative to the purchase of the bridge.

Plaintiff's demurrer substantially raises two questions: (a) Whether sufficient facts are pleaded so as to constitute a basis for the comment and criticism appearing in the editorials; and (b) whether the publication stating facts relative to official acts of a state officer for the sole purpose of giving what is honestly believed to be true information given in good faith is privileged, although certain matters stated in the article may be untrue, and in fact a disparagement of the character of the person discussed therein. The question certified by the trial court submits the sufficiency of the plea in general terms.

It will be noted that the sufficiency of the amended special plea of privilege and fair comment is the only question under consideration, and any statement or expression made is restricted thereto.

It is appropriate to say that the plea is prolix. It partakes of the nature of an answer to a bill of complaint rather than a definite confession and avoidance of the allegations of a declaration. However, there is no paucity of factual statement in the plea, and as to form the plea is good on demurrer. Odgers on Libel and Slander, 6th Ed. pages 165-167, 514. A plea similar to the one here under consideration was discussed in the case of *Sutherland* v. *Stopes,* reported in 94 L. J. K. B. 166, and is aptly described in the following quotation from the opinion by Viscount Finlay:

> "If the facts are truly stated with regard to a matter of public interest, the defendant will succeed in his defence to an action of libel if the jury are satisfied that the comments are fairly and honestly made. To raise this defence there must, of course, be a basis of fact on which the comment is made. For a good many years past a practice has prevailed of raising this defence by what has been called the 'rolled-up plea,' but it will be found that this term is a misnomer based on a misconception of the nature of the plea. Such a plea states that the allegations of fact in the libel are true, that they are of public interest, and that the comments upon them contained in the libel were fair. The allegation of truth is confined to the facts avered, and the averment as to the comments is not that they are true but only that they were made in good faith, and that they are fair and do not exceed the proper standard of comment upon such matters. * * * It has been sometimes treated as containing two separate defences rolled into one, but it in fact raises only one defence, that being the defence of fair comment on matters of public interest. The averment that the facts were truly stated is merely to lay the necessary basis for the defence on the ground of fair comment. This averment is quite different from a plea of justification of a libel on the ground of truth, under which the defendant has to prove not only that the facts are truly stated but also that any comments upon them are correct."

The substance and effect of the plea here considered is that certain facts stated in the editorials are true and furnish a sufficient basis for comment; or, if the comments and criticism be regarded as statements of fact rather than comment or criticism that the same were published on an occasion of qualified privilege. Casting aside for the moment the question of privilege, we direct our attention to the sufficiency of the facts pleaded as true as furnishing a basis for fair comment.

A statement of fact, inferences therefrom, comments, criticisms and opinions of a writer are frequently so blended in a writing that the line of demarcation between them is difficult to draw.

The basic facts from which defendants' inferences were drawn and on which their opinions were founded may be stated as follows: (1) That the bridge could have been purchased 'at a lower price than that paid by the State, and that the transaction was knowingly manipulated so as to require payment of a commission to Neal, thus making an indirect and unauthorized payment out of funds belonging to the State of West Virginia; and (2) that the sale of the bonds of the State at private sale and without competitive bidding permitted private profit at public expense.

An extended analysis of each word, phrase, and sentence contained in the editorial is neither practicable nor necessary. It is often the case that words, phrases and even sentences considered apart from the context of the writing in which they appear have a meaning different from that necessarily attributed to them when the entire writing is analyzed and considered.

It is observed that the statement in the first publication that "the state administration in the most accommodating way delegated an agent to represent it in dealings with the bridge company" and "this agent delegated by the Neely Deal is a prominent politician of Cabell County" are not explicitly alleged to be true. The foregoing statements, when considered alone, are not derogatory to the

plaintiff. Delegation of an agent, or dealing with one in the sale of the bridge, would neither be harmful nor the subject of criticism if the price of the bridge were not increased by the employment of such agent. It is only when the above quoted statements are read together with the other portions of the editorial, the truth of which are alleged, that the implication of the statements appear. The first statement above quoted is a statement of fact; the second statement is partially an inference from the first and partially an independent statement of fact with reference to the identity of the agent. They are harmless when read alone and only become inimical when read with the other statements of fact in the editorial pleaded as true.

As hereinbefore stated, it is alleged as true that plaintiff directed or caused the bridge corporation to employ Neal as agent in the purchase of the bridge, or that plaintiff consented to and approved such employment, with full knowledge that the price of the bridge would be increased by Neal's intervention in the transaction. The ill effects of plaintiff's action are not found in causing or permitting the employment of an agent but in so acting with knowledge that the intermediation of the agent would needlessly increase the price of the bridge.

It is clearly alleged in the plea that the bridge could have been purchased at a lower price without the services of an agent, and that plaintiff had knowledge of such fact, and, if true, the inference follows that it was the duty of plaintiff to purchase the bridge for the State direct from the owner at the lower price. The allegations of the plea vouched as true show that notwithstanding plaintiff's duty in that respect, he directed and caused, or consented to and approved, the employment of Neal. The plea clearly alleges sufficient facts from which it appears that Neal's employment as agent to sell the bridge was caused or approved by the plaintiff, and that the effect thereof was to increase the price of the bridge at the expense of the State of West Virginia. Treating the matters alleged in

the plea to be true, the comments appearing in the editorials are not so violently or intemperately expressed as to transcend the right of fair comment made on the basis of truth. It is generally held that a person by truly stating facts as to matters of public concern may fairly comment thereon, and temperately criticize persons concerned in, and acting with reference to, such matters. Restatement of the Law of Torts, Volume 3, Section 606; Odgers on Libel and Slander, page 166; see also Am. Jur., Title, Libel and Slander, Section 161; *Gandia* v. *Pettingill*, 222 U. S. 452, 32 Sup. Ct. 127, 56 L. Ed. 267; *Howarth* v. *Barlow*, 99 N. Y. S. 457.

If the facts expressed in a writing form a sufficient, reasonable and logical basis for the inferences, comments, criticisms and opinions expressed, no liability for such comment is imposed on the defendants, even if the comment is uncharitable. *Howarth* v. *Barlow*, *supra*.

The editorials state that bonds of the State of West Virginia in the face amount of $1,040,000 were sold at private sale without competitive bidding. In the second publication it was stated that the rate of interest on the bonds was three per cent. It is then inferred that the sale of the bonds resulted in profit to some unknown person. The plea avers the truth of the foregoing and that it has been the custom of the State to sell its bridge revenue bonds to the highest bidder, but in this instance sale of the bonds was not advertized; that it was the opinion of the defendants that three per cent was a high rate of interest; and that sale of the bonds in the manner alleged resulted in private gain or profit. The statement in the editorials and the averments of the bill are cognate. The facts stated in the editorials and pleaded in the plea are sufficient to support the inferences drawn by the defendants and the comments made thereon.

The official acts of a public officer are in a different category from the physical, mental and moral qualifications of a candidate for public office, discussed in the case of *Sweeney* v. *Baker*, 13 W. Va. 158. A public officer as-

sumes the obligation of an oath before entering on the discharge of his duties. Once appointed or elected, the unyielding requirements of public welfare demand that a public officer keep in view only one object—the strict performance of his duties in accordance with law and the unchanging principles of honest government. The slightest departure from such standard of conduct can be neither excused nor condoned. Adherence to a high standard of official conduct is stimulated by investigation and reasonable and honest criticism.

As is apparent from that portion of the plea hereinabove quoted the alternative defense of qualified privilege is pleaded in the event that any part of the editorials be regarded as factual statement rather than comment. Attempts have been made to distinguish a plea of qualified privilege and a plea of fair comment and criticism. Both pleas, in substance, allege that the publication was made without malice. "In either case the question raised is really as to the state of mind of the defendant when he published the alleged libel, the question being in one case whether he has published it in a spirit of malice, in the other whether he published it in the spirit of unfairness." *Plymouth Mutual Co-Operative and Industrial Society* v. *Traders' Publishing Association,* (1906) 1 K. B. 403; *Thomas* v. *Bradbury, Agnew & Co., Ltd.,* (1906) 2 K. B. 627, 6 Anno. Cas. 135. The defense of qualified privilege may be made under the plea of general issue. *Swearingen* v. *Parkersburg Sentinel Co.,* 125 W. Va. 731, 26 S. E. 2d 209; *Hancock* v. *Mitchell,* 83 W. Va. 156, 98 S. E. 65. But there is no legal barrier to specially pleading the defense of qualified privilege which is in the nature of confession and avoidance. *Hancock* v. *Mitchell, supra.*

The question raised by that part of the plea hereinabove quoted, presenting the alternative defense of privilege, is that the subject of the editorials was a matter of public interest and concern, and that defendants were entitled to discuss the same freely, and that although

untrue statements may appear therein that such statements were made in good faith without malice upon reliable information with reasonable grounds for belief, and that defendants honestly believed them to be true.

There is confusion and conflict in the modern law of defamation. For a history and theory of this branch of the law see 3 Columbia Law Review, page 546.

The authorities are in accord that fair comment and criticism of the official acts of a public officer made in good faith, if properly supported by factual statement, are qualifiedly privileged. But there is a divergence of opinion in the various jurisdictions as to whether a misstatement of fact made concerning a public officer is privileged. A majority of the courts in the United States hold that there is no distinction between false statements made with reference to the official conduct of a public officer and the conduct of a person in private life, and that a false statement relative to official acts of a public officer is not privileged. In other jurisdictions it is held that a misstatement of fact concerning official conduct of a public officer is within the rule of qualified privilege, if the other essentials for such privilege are present. Typical of authorities supporting the rule first mentioned are the cases of *Burt* v. *Advertiser Newspaper,* 154 Mass. 238, 28 N. E. 1, and *Post Publishing Co.* v. *Hallam,* 59 F. 530. The second rule noted above is enunciated in the cases of *Coleman* v. *MacLennan,* 78 Kan. 711, 98 P. 281, and *Jackson* v. *Pittsburgh Times,* 152 Pa. 406, 25 A. 613. The two rules above mentioned are stated and annotated in 110 A. L. R. page 412 et seq. See also page 222 of Tentative Draft No. 13 of the Restatement of the Law of Torts, where the authorities sustaining each rule are collated.

The principal reasons assigned for the majority rule is that honest men will be deterred from seeking and holding public offices and that the press will become depraved and assume a license to publish libelous matter. On the contrary, cases which follow the minority rule advance the reasons that denial of qualified privilege shields the

dishonest official from criticism and lowers the standard of official conduct; that the honest public officer will suffer no harm by permitting official acts to be canvassed with a freedom and latitude consistent with good faith and that freedom of statement is conducive to a high standard in the activities of the public press. We accept and approve the reasons adduced for the last-mentioned rule.

This jurisdiction has in a measure adhered to the majority view. *Sweeney* v. *Baker, supra.* In the *Sweeney* case the defamatory publications were predicated on the mental and physical qualifications and moral character of a candidate for public office. In this case the statement of facts relates to the official acts and conduct of a public officer. In both cases the medium of publication was a newspaper. The questions at issue here being different from those discussed by Judge Green in the case of *Sweeney* v. *Baker, supra,* we are not called upon to expressly overrule that case. But there are statements made in the opinion in the *Sweeney* case inconsistent with the opinion herein and, to the extent of such inconsistencies, the conclusions reached in the *Sweeney* case are disapproved. This Court has held that a false statement made in a petition for the removal of a public officer addressed to a tribunal having the power to remove, if made in good faith without malice and without knowledge of its falsity, is qualifiedly privileged, even though the person making the statement had no right to prosecute the removal proceeding. *Hancock* v. *Mitchell, supra.* In the *Hancock* case the Court upheld and vindicated the right of citizens to petition public officers and tribunals for redress of grievances as being guaranteed by Article III, Section 6 of the Constitution of West Virginia.

The constitutional provision relating to the freedom of the press forbids the passage of a law by which such freedom may be curtailed or diminished, and authorizes the passage of laws providing for punishment of libel and recovery of civil damages by persons defamed. Article III, Section 7, Constitution of West Virginia. The consti-

tutional provision relative to the freedom of the press confers no special privilege or right upon a publisher of a newspaper in relation to the law of defamation. Any person has the same right as a publisher of a newspaper. *Sweeney* v. *Baker, supra; Swearingen* v. *Parkersburg Sentinel Co., supra.* No person has a right to maliciously defame another.

Improvements in mechanical appliances for printing and advances in the methods of collecting and disseminating news and writings on matters of public interest have made modern newspapers a powerful and effective instrument in molding and guiding public opinion. This power imposes a moral and social duty upon the publishers of newspapers to make no statement with reference to official conduct until an honest and diligent effort has been made to ascertain the truth of the matter stated.

No allegation is made in the plea as to the effort made by the defendants to ascertain the truth of the statements made in the editorials, but it is clearly pleaded that defendants actually and honestly believed in their truth. An honest belief presupposes an effort to ascertain the truth, in the absence of which the belief would be groundless.

If the inquiry is such as to generate an honest belief in the truth of the matters investigated and publication is made in good faith, for worthy purposes, malice should not be imputed to the publisher as a matter of law. The majority rule makes no distinction between a statement with reference to a person in private life and a public officer. The distinction between a statement with reference to private gossip and a scandal and one concerning an act or conduct of public interest is so palpable as to require no elucidation. Consideration of peace and order between individuals calls for repression and punishment of false and defamatory statements of fact concerning the private person. There are equally cogent reasons for liberality of statement in matters of public concern. A citizen of a free state having an interest in the conduct

of the affairs of his government should not be held to strict accountability for misstatement of fact, if he has tried to ascertain the truth and, on a reasonable basis, honestly and in good faith believes that the statements made by him are true.

We are urged to modify, disapprove or overrule the opinion of this Court in the case of *Swearingen* v. *Parkersburg Sentinel Co., supra.* The principles announced in the *Swearingen* case appear to be sound in reason and application. No sufficient reason has been brought to our attention to call for alteration of the opinion in that case.

In accordance with the better reasoned rule on the subject, we reach the conclusion that the official acts of a public officer are of such concern and importance to the public generally that a misstatement thereof is qualifiedly privileged if made in good faith and in a reasonable and honest belief that the statement is true. We restrict the rule as stated above to official acts done in the performance of a public officer's official duty.

The action of the Circuit Court of Kanawha County in overruling plaintiff's demurrer to defendants' special plea is without error and is affirmed.

*Affirmed.*