127 So.2d 718 (1961)
MIAMI HERALD PUBLISHING CO., a Florida corporation, Appellant,
v.
Dorothy M. BRAUTIGAM, as Administratrix of the Estate of George A. Brautigam, Deceased, Appellee.
No. 58-409.
District Court of Appeal of Florida. Third District.
March 9, 1961.
Rehearing Denied March 23, 1961.
*719 Smathers, Thompson & Dyer, Miami, and Elisha Hanson, Washington, D.C., for appellant.
Paul A. Louis, Bertha L. Freidus, Miami, and Melvin M. Belli, San Francisco, Cal., for appellee.
HORTON, Chief Judge
The appeal in this case was first lodged in this court. Upon motion of the appellee, and after argument of both counsel, the cause was, on November 24, 1958, ordered transferred to the Supreme Court of Florida. On June 15, 1960, the Supreme Court of Florida, by opinion and judgment,[1] ordered the cause transferred back to this court, where the matter was orally argued on the merits.
Appellant prosecutes this appeal from a final judgment entered upon a jury verdict in an action for libel.
The record discloses that George Brautigam filed suit against the appellant newspaper alleging that certain editorial articles, published by the appellant, were defamatory. These articles allegedly criticized Brautigam's attempts, in his capacity as State's Attorney, to suppress an interim report of the Dade County Grand Jury for the 1955 Fall Term. The appellant denied the editorials were false or maliciously published but admitted that a demand for retraction had been made and refused. In a separate defense, the appellant alleged that the matters of fact contained in the editorials were true; that the opinions expressed were fair comment, made in good *720 faith, without malice, and were privileged under both the Constitution of the United States and the Constitution of Florida.
The jury returned a verdict awarding $25,000 compensatory damages and $75,000 punitive damages. During the pendency of appellate proceedings, Brautigam passed away and his wife was substituted as appellee.
This controversy can be more easily understood when visualized against the background of public events which transpired in Dade County during the spring of 1956. It was during this period that public attention was focused upon the administration of justice in Dade County. It was a "poorly kept secret" and "common gossip" that the Grand Jury was investigating the conduct of certain members of the judiciary and bar. On the morning of April 26, 1956, Brautigam, as State's Attorney, was requested by the Grand Jury to examine its interim report. Upon examination, he advised that the report was in an illegal form and should be redrafted. Later the same day, Brautigam was advised that the Grand Jury was going to file its report in substantially the same form as before. He then appeared before the court when the report was about to be filed and requested the court to withhold filing of the report until he, Brautigam, could file a written motion setting out the reasons why it was invalid and should not be made a part of the public records. This request was granted and the court set the matter for argument on the afternoon of Monday, April 30, 1956.
A written motion to suppress the report was filed by Brautigam and copies distributed to all news media, including the appellant. This motion clearly stated that neither Brautigam nor any member of his staff was involved in the Grand Jury report.
Pursuant to its news coverage of this story, the appellant published the following editorial in its newspaper issue of Saturday, April 28, 1956:
"People Have the Right to Know
"Why Does State Attorney
Muzzle The Grand Jury?
"The Action of George A. Brautigam, state attorney, in throwing a road block in front of a hard-working, conscientious Grand Jury, raises two immediate questions:
"`Is he afraid of something, or of someone?'
"`Is he trying to protect someone?'
"Neither may be the reason, but the State Attorney has invited both questions.
"The Grand Jury is the people's agency of investigation.
"It supplements the work of the State Attorney, who is the people's prosecutor in important cases.
"His office, however, is not above the Grand Jury's attention.
"When the State Attorney and the Grand Jury are in conflict, as in this instance, the people's rights are in jeopardy.
"In asking Judges [sic] Robert L. Floyd of Circuit Court to withhold the jury's report, Brautigam is off the track of his public responsibility. We think the judge should have told him so instead of granting his request.

* * * * * *
"As Long as Brautigam stands in the untenable position of asking the court to keep the jury's findings from the people he invites suspicion.
"He can remove it only by reversing his course; By making available to the people, who have the right to know, what the Grand Jury has uncovered.
"As it stands, Brautigam, the man the people elected to represent them, has run out on them.
"Who will speak for the people in Judge Floyd's court Monday?"
*721 Upon reading this editorial, Brautigam visited the office of appellant's managing editor and voiced his objection to the unfair manner in which his actions were being reported. He requested his side of the story be published.
Thereafter, on Monday, April 30, 1956, the appellant published the following editorial:
"Who Will Represent the Public?
"State Attorney Brautigam Runs
Out On The People
"This Afternoon at 2 o'clock, the people's right to know what its own agency, the Grand Jury, is doing will be tested before Judge Robert L. Floyd in Circuit Court.
"Who will represent the people in this outlandish situation in which they have been blocked by court order from being told what their Grand Jury wants to tell them in the interest of law and order.
"State Attorney George Brautigam was permitted by Judge Floyd to withhold release of the jury's report until Brautigam had a chance to review the contents. It was highly unusual, if not unprecedented procedure.
"Brautigam is the people's lawyer through the office that he holds.

* * * * * *
"Judge Floyd should take full cognizance of the fact that in seeking even a temporary suppression of the jury's report, Brautigam was not the servant of the people. He ran out on them.
"Judge Floyd should see to it that the people are ably and immediately represented if he feels that his judicial position prevents him from assuring the people in their right to know.
"The Dade County Grand Jury Association should get in touch with Gov. LeRoy Collins, point out that Brautigam turned his back on the people who employ him as well as on his job when he got the court to hold release of the jury's report, and demand his replacement.
"The people of this county will watch with concern and long memories how their rights are safe-guarded by interested officialdom this afternoon."
After reading this editorial in an early edition of the Monday paper, Brautigam, by telegram addressed to the managing editor, demanded a retraction. The appellant refused the demand.
At the hearing on the Grand Jury report, the circuit court overruled Brautigam's motion to suppress and ordered the report spread on the public records. This order was subsequently reversed on appeal and the report ordered expunged by the Supreme Court of Florida. State ex rel. Brautigam v. Interim Report of Grand Jury, Fla. 1957, 93 So.2d 99. In May, 1956, Brautigam was defeated in his bid for reelection as State's Attorney.
The appellant contends the judgment deprived it of the right of free speech and fair comment guaranteed by the First and Fourteenth Amendments of the United States Constitution, as well as Section XIII of the Declaration of Rights of the Florida Constitution, F.S.A.
In the United States and this state, every citizen is guaranteed the right of fair expression. This right includes freedom of speech and of the press. However, both the citizen and the newspaper are held to the same liability for the abuse of these rights. Freedom of speech and freedom of the press do not carry with them freedom from responsibility in the misuse of those rights. See Ross v. Gore, Fla. 1950, 48 So.2d 412; Pennekamp v. State of Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295.
In contrast to the right of free speech, the law of libel exists as limitation on the right of every citizen to write freely. It has long been established that the guarantees of free speech and press do not render the publisher of lewd and obscene materials, *722 profane statements or defamatory utterances immune. See Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031; Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 86 A.L.R. 466. The difficulty in construing these constitutional guarantees arises when the right of free expression collides with an individual's right to the protection of his good name. These conflicts defy precise analysis. However, it is sufficient for this discussion to say that the rights of free speech and press were designed primarily to prevent interference by the government with a man's speech or writing but not to obviate his responsibility for what has been published.
The reported decisions of this state, as well as others, clearly establish that a publication is libelous, per se; that is, actionable, per se; without a showing of special damage, if it imputes to another (a) a criminal offense amounting to a felony; or (b) a presently existing venereal or other loathsome and communicable disease; or (c) conduct, characteristics, or a condition incompatible with the proper exercise of his lawful business, trade, profession or office; or (d) the other being a woman, acts of unchastity. Teare v. Local Union No. 295, Fla. 1957, 98 So.2d 79.
The principle defenses to an action upon a publication, libelous, per se, are consent, justification and privilege. The defense of privilege has been by some subdivided into three distinct classifications, i.e., (1) absolute privilege; (2) qualified privilege; and (3) fair comment. See 3 Restatement, Torts, Chap. 25. Others classify the defense of fair comment as merely another aspect of the defense of qualified privilege. See Prosser, Torts, 2d Ed., § 95, p. 607. Cf. Jones v. Townsend's Administratrix, 21 Fla. 431; and Montgomery v. Knox, 23 Fla. 595, 3 So. 211; with State ex rel. Arnold v. Chase, 94 Fla. 1071, 114 So. 856 and White v. Fletcher, Fla. 1956, 90 So.2d 129. 3 Restatement, Torts, § 606, p. 275, defines privileged criticism (fair comment) thusly:
"§ 606. General Principle.
"(1) Criticism of so much of another's activities as are matters of public concern is privileged if the criticism, although defamatory,
"(a) is upon,
(i) a true or privileged statement of fact, or
(ii) upon facts otherwise known or available to the recipient as a member of the public, and
"(b) represents the actual opinion of the critic, and
"(c) is not made solely for the purpose of causing harm to the other.
"(2) Criticism of the private conduct or character of another who is engaged in activities of public concern, in so far as his private conduct or character affects his public conduct, is privileged, if the criticism, although defamatory, complies with the requirements of Clauses (a), (b) and (c) of Subsection (1) and, in addition, is one which a man of reasonable intelligence and judgment might make."
Newell, Slander and Libel, p. 516, says:
"Every person has a right to comment on matters of public interest and general concern, provided he does so fairly and with an honest purpose. Such comments are not libelous, however severe in their terms, unless they are written intemperately and maliciously. Every citizen has full freedom of speech on such subjects, but he must not abuse it. The general rule to be adhered to in criticising or commenting upon matters of public interest is to confine the comments to the matter itself, and not to descend to personal attacks on private character or imputations of unworthy motives."
The press, while guaranteed the right to publish the truth supported by good *723 motives, has no right to publish falsehoods to the injury of others. A high degree of care is required by law to be exercised by newspaper publishers to avoid the commission of wrongs in the publication of false articles or news of a personal nature concerning which the publisher holds himself or his agents out as author and composer. See Layne v. Tribune Co., supra.[2]
The great majority of American courts hold that no comment can be fair if it is based on misstatements of fact. See Noel, "Defamation of Public Officers and Candidates," 49 Colum.L.Rev. 875, 896. We concur in this view and align ourselves with the majority.
The appellant urges that we reverse the trial court and adopt a rule by which corrupt or dishonorable motives may be imputed to others where such imputations are warranted by the facts. Such a construction of the defense of fair comment has been accepted in England and a minority of American courts. See Gatley, Libel and Slander, 4th Ed., p. 339, and Foley v. Press Pub. Co., 1929, 226 App.Div. 535, 235 N.Y.S. 340. Cf. Rathkopf v. Walker, 190 Misc. 168, 73 N.Y.S.2d 111 and 274 App. Div. 1064, 85 N.Y.S.2d 351.
It is our opinion that the better view supports the holding that the defense does not embrace the right to falsely impute one's motives, want of loyalty or misconduct in office. See State ex rel. Arnold v. Chase, supra; Jones v. Townsend's Administratrix, supra; and McClellan v. L'Engle, 74 Fla. 581, 77 So. 270. To excuse such an attack, the critic must show the truth of what he has uttered. This, of course, does not include those instances described in Rathkopf v. Walker, supra [190 Misc. 168, 73 N.Y.S.2d 117], as "mere exaggeration, slight irony, or wit, or all those delightful touches of style which go to make an article readable, do not push beyond the limitation of fair comment. Facts do not cease to be facts because they are mixed with the fair and expectant comment of the story teller, who adds to the recital a little touch by his piquant pen."
The appellant contends that the trial judge erroneously failed to instruct the jury that the burden of proof was upon Brautigam to show the falsity of the editorials and the newspaper's actual malice in the publication thereof. The trial judge did instruct the jury that the defense of truth, plus good motives and fair comment, are affirmative defenses as to which the defendant has the burden of proof. He further charged the jury, as a matter of law, that the editorials were matter of public interest.
As to the defense of fair comment, the jury was instructed that if it should find the editorials met the test of fair comment, the defendant would have then carried the burden of proof as to this affirmative defense, and in such event, the burden was on the plaintiff to prove the defendant's publication of the editorials was motivated by actual malice.
The trial judge's instructions to the jury upon the burden of proof constitute a correct and fair statement of the law, and the refusal to give appellant's requested instructions on this issue was not error. See Edwards v. Doherty, Fla. 1954, 74 So.2d 686. See also White v. Fletcher, supra; Abraham v. Baldwin, 52 Fla. 151, 42 So. 591, 10 L.R.A.,N.S., 1051; Crowell-Collier Publishing Co. v. Caldwell, 5 Cir., 1948, 170 F.2d 941.
The appellant further complains that the court erred in permitting the issue of punitive damages to go to the jury. As *724 stated in Phillips & Sons v. Kilgore, 152 Fla. 578, 12 So.2d 465, 467:
"Punitive or exemplary damages is an amount allowed over and above actual or compensatory damages. Its allowance depends on malice, moral turpitude, wantonness, or the outrageousness of the tort and is awarded as a deterrent to others inclined to commit a like offense. It is in the province of the trial court to determine as a matter of law whether or not there is a basis for punitive damages and instruct the jury accordingly. Whether or not the elements are present to warrant it is for the jury in the light of all the facts of the case."
From our review of the record, we are of the opinion that the trial judge acted within his sound judicial discretion when he submitted this issue to the jury for its consideration.
We have considered the remaining questions presented by the appellant but fail to find any harmful or prejudicial error.
We conclude the evidence presented to the jury was sufficient, if believed, to support the judgment and that it should be affirmed.
Affirmed.
PEARSON, J., concurs.
CARROLL, CHAS., J., dissents.
CARROLL, CHAS., Judge (dissenting).
I respectfully dissent from the judgment of affirmance. The admission of certain evidence over defendant's objection, and the giving of a charge concerning fair comment, both of which appear to have been erroneous and highly prejudicial, require reversal and a new trial.
First  and this was a fatal error which permeated the entire case  through a series of rulings, plaintiff's counsel was permitted to file in evidence and present and explain before the jury a judgment and opinion of the Supreme Court of Florida,[1] hereafter referred to as the Interim Report case, which was rendered ten months after the publications, and by which the Supreme Court ruled that the grand jury presentment involved here should have been suppressed and ordered it expunged from the records, holding it was proper for the state attorney to suppress the grand jury report and presentment dealing with a judge of the court and certain lawyers,[2] and commending the state attorney for having attempted to do so.[3]
*725 At the risk of oversimplification, it may be said that the manner and extent to which the defendant publisher was deprived of the benefit of the defense of fair comment and, therefore, of its constitutionally guaranteed freedom of speech and of the press, was this: Under the law upon which the publisher was entitled to rely when the publications were made, the defendant publisher might or might not have succeeded before a jury on the defense of fair comment, but on the basis on which this case was tried, with the subsequently rendered Interim Report case opinion of the Supreme Court of Florida before the jury, the defense was doomed.
The prominence given to that subsequent decision, and the degree to which the plaintiff relied on it as the basis on which to gauge the propriety and reasonableness of the publications as comment and criticism of the conduct of a public official and on a matter of public interest, are apparent from the record. That Supreme Court opinion was brought before the jury at the outset of the trial by plaintiff's counsel in his opening statement. R. 159-160. Defendant's objection and its motion for a mistrial were denied. R. 165. Later, during the presentation of the plaintiff's case, the opinion was introduced into evidence by plaintiff's counsel (R. 232 et seq.), and was read in full to the jury. R. 237. Defendant's objection to its introduction was denied. R. 236. Again, in final argument or summation, it was reveiwed and read from to the jury by plaintiff's counsel. R. 744-747. Error was assigned and the point was made and argued in appellant's brief.
The law is settled that publications claimed to be libelous are to be judged as of the time and surrounding circumstances when they were made. Thus, the publications must be judged in relation to the understanding and opinion of the publisher and the public at the time which and in the community where the publications appeared. See Myers v. Hodges, 53 Fla. 197, 44 So. 357, 365; Massee v. Williams, 6 Cir., 1913, 207 F. 222, 231; Sweeney v. Schenectady Union Pub. Co., 2 Cir., 1941, 122 F.2d 288, 290; Spanel v. Pegler, 7 Cir., 1947, 160 F.2d 619, 622, 171 A.L.R. 699; Holden v. American News Co., D.C.E.D. Wash. 1943, 52 F. Supp. 24, 31; Knapp v. Post Printing & Publishing Co., 111 Colo. 492, 144 P.2d 981, 984; Tidmore v. Mills, 33 Ala.App. 243, 32 So.2d 769, 775; Harper Privileged Defamation, 22 Va.L.Rev. 642, 653 (1936); Note, 15 So.Cal.L.Rev. 274, 275 (1942). See also, Klein v. Belle Alkali Company, 4 Cir., 1956, 229 F.2d 658, 660. We need not go outside of the State of Florida for authority to support that proposition. In Myers v. Hodges, supra, the Supreme Court of Florida said (44 So. at page 365):
"In the instant case, how could the court or jury know from evidence of plaintiff that the terms of the publication or bill of complaint were in manifest excess of the occasion, or went beyond what was reasonable in imputing crime, or contained strictures on motives and conduct not warranted by the facts? The plaintiff failed to show these facts to the jury. The plaintiff did not show by an exhibition of the entire bill of complaint or otherwise the occasion for the use of the defamatory matter, so that the court or jury could see whether the defamatory matter was in excess of the occasion, or went beyond what was reasonable in *726 imputing crime, or contained strictures on motives and conduct not warranted by the facts. The facts showing the occasion of the use of the defamatory matter were not given in evidence.
"As we have seen, where the matter complained of is qualifiedly privileged, the burden of proving malice lies on the plaintiff, and, if the evidence adduced is equally consistent with either the existence or nonexistence of malice, there can be no recovery, for there is nothing to rebut the presumption which has arisen in favor of the defendant from the privileged publication. Newell on Slander and Libel, §§ 23, 24.
"The burden of proving malice being on the plaintiff, who relied only upon the intrinsic evidence of malice arising from the violence of defendant's language, it became incumbent upon the plaintiff to show by the entire bill of complaint, or some other competent evidence, that the defamatory matter was in excess of the occasion, or inconsistent with the nonexistence of malice. The plaintiff, however, failed to make this proof, and, the evidence being demurred to, the court properly sustained the demurrer to the evidence, as there was nothing to rebut the presumption which arose in favor of the defendant from the qualifiedly privileged publication."
If, as held in the Myers case, it was necessary for the plaintiff to show the facts and circumstances which were applicable at the time of the alleged libelous publication in order to determine whether it was "in manifest excess of the occasion, or went beyond what was reasonable in imputing crime, or contained strictures on motives and conduct not warranted by the facts," then it was error for the plaintiff to show in evidence, as the basis for such a test of the publications, the circumstances as determined by the Supreme Court in the subsequent opinion, rather than those on which the publisher relied or formed his understanding. That was clearly so in the present case, because the circumstances which prompted the publications, and which would have to be looked to for their justification, related to the nature and extent of the right of a grand jury to file a presentment against a public official, as those matters were reasonably understood to be, on the strength of cases then decided, and, on the same basis, the public interest in such reports being made known. There was no problem as to the other facts, such as that a grand jury was in session; that it was common knowledge that it was investigating a judge or judges of the court; that it was ready to make a report based on its investigation and that the state attorney was seeking to suppress the report or the portion of it dealing with such investigation.
If the publisher, as any other lay member of the public, on the basis of his general understanding of law and custom as it was at that time, was justified in believing that a grand jury could investigate officials and file presentments against them critical of their conduct; that such grand jury investigations and reports were vital to the public interest, and should be filed and made known even though they might go so far as to impugn the character of public officials and report them as being unqualified or unfit to remain in office, and that if they should contain matter against an official which would be held to impugn him without cause, that the precedents in Florida were that the report shall be made public, following which some part might, if found necessary, be expunged later on the official's motion, and that it was in the public interest, and, therefore, incumbent upon the state attorney to bring the report out rather than to suppress it, then it would be a question for the jury to determine whether the comments and the opinions of the publisher, readily determinable as such, which questioned the state attorney's motives in seeking to block the filing of the report and which classified such conduct as *727 a serious breach of his duty to the public, were justified under the circumstances and within the range of the publisher's qualified privilege of fair comment and constitutionally guaranteed freedoms of speech and of the press.
Tedious though the process may be, it seems necessary to examine the holdings in certain earlier cases dealing with grand jury presentments which fixed the law as it stood when the editorials were published, and to contrast the subsequent decision in the Interim Report case.
The earlier cases gave no reason to assume or believe that grand jury presentments criticizing public officials and even impugning their character or motives or concluding that they might be unfit for office, were not required to be filed and made public, although if in some particulars they went beyond what was permissible, the excessive portion could be expected to be expunged later on the suit or motion of the official involved. See In re Report of Grand Jury, 1943, 152 Fla. 154, 11 So.2d 316, hereinafter referred to as the Graves case; Owens v. State, Fla. 1952, 59 So.2d 254; and Ryon v. Shaw, Fla. 1955, 77 So.2d 455, 457, 48 A.L.R.2d 713.
In the Graves case, a grand jury report on a constable presented him as being guilty of misconduct in office for which he could have been indicted, but for which instead it was recommended that he be removed from office.[4] In Owens, the Supreme Court affirmed an order denying a motion of members of a city council to expunge a grand jury presentment which reported they had shown gross incompetence in handling taxpayers' money in relation to issuance of revenue bonds and an award of a contract for installation of waterworks. The filing of that report was considered appropriate, and it was allowed to stand. In Ryon, a public school commissary manager, whom a grand jury presented as not having "the qualification to head a department that specializes in child nutrition and education," sued the grand jurors for libel. The Supreme Court affirmed the dismissal of his complaint on holding that the presentment was proper to be filed against him.
True, in the Graves case the Supreme Court stated certain limitations, saying a grand jury would "not be permitted to single out persons in civil or official position to impugn their motives, or by word, imputation, or innuendo hold them to scorn or criticism," nor "to speak of the general qualification or moral fitness of one to hold an office or position," adding, however, "but whether or not a county office is being conducted according to law and good morals is at all times within the jurisdiction of the grand jury to investigate." [152 Fla. 154, 11 So.2d 318] But in reading those limitations it must be noted that the court felt that what the grand jury said about the misconduct of the constable and his unfitness for office did not exceed the stated limits. In the Owens and Ryon cases, those limitations were referred to, but those cases qualified the limitations by saying that such things could not be stated without cause, thus inviting their interpretation as holding that an official's character and motives could be impugned and his unfitness for office reported when there was cause to do so. Nowhere in those three earlier decisions had the Supreme Court held or said that reports accusing officials of misconduct in office and recommending *728 their removal, or suggesting their unfitness, should be suppressed and not filed. Rather those decisions had suggested and even demonstrated that reports which appeared to be of that character would be filed and approved. If what was said about the officials in those three cases did not amount to impugning their character and motives, or passing on the question of their fitness to serve, the distinction is fine, and one which a layman hardly would be expected to recognize. Also, one reading those earlier decisions would be most likely to interpret them as having held that the interest of the public in having such presentments made known was far greater than the incidental injury and embarrassment which the process might impose on the official involved. There is a temptation here to quote at length from these three cases on that subject. To do so would unduly extend an already long opinion. Attention is directed to what was said in the Graves case (11 So.2d at page 319) about the value to the people and to democracy of being able to know, through reports thereon by the grand jury, when public trusts are being abused by officials; and regarding the grand jury as important to the people through making known to the public the deficiencies or unfitness, where so found, of its servants; and the rejection there of the contention that such action by the grand jury should not be substituted for orderly processes of the law in regard to official misconduct.
In the Owens case (59 So.2d at page 256) the power of the grand jury to investigate and make a fair report on the misconduct of officials "whatever the delinquency may be" was reiterated, with the comment that such could be done whether or not they were charged with crime. Also, in the Ryon case (77 So.2d at page 457) in which the grand jury reported that an officeholder was unqualified, and therefore unfit to serve in the position he held, the court stated that such a presentment is "one of the safeguards of democratic government," and that the democratic process required that the grand jury be permitted to tell the truth of what it finds regarding the officials it investigates. The court in that case went on to say that there is "no greater deterrent to evil, incompetent and corrupt government than publicity," adding that grand jury investigations and reports are a means to that end and that so long as they are accomplished within reasonable bounds courts are without power to interfere with the process.
In the Ryon case (the later Interim Report case to the contrary) it was expressly held that a grand jury could publish "false and defamatory matter," if it has some relationship to the cause at hand. Also, it should be noted that in the Graves case (again with the Interim Report case to the contrary) the contention by the official who was castigated in that report that it "deprives him of the right to be heard in his defense, the right to face his accusers and to answer the charge against him," was rejected by the Supreme Court with the answer that such was the nature of grand jury investigations; and the right of the grand jury to so act, rather than to indict him, was there approved.
A casual reading of the later Interim Report case (State ex rel. Brautigam v. Interim Report of Grand Jury, Fla. 1957, 93 So.2d 99) reveals certain changes of view from those expressed in the earlier decisions, and that they were such, when shown to the jury, as to compel a finding that the publications were not justified.
In that subsequent case it was held that a presentment against an official which slanders him and challenges his fitness to serve in his office, is without jurisdiction and may not be filed unless followed by an indictment, and that if indictable offenses are disclosed to the grand jury on the investigation, they should indict instead of filing a presentment. Yet surely one would have been justified in not construing the earlier cases as so holding. In the Graves case the court had recognized that the required charges to the grand jury include *729 their duty, as specified by § 8215, C.G.L. 1927 (now § 932.15, Fla. Stat., F.S.A.), to "present every offense against the penal laws of the State, whether any specific punishment is pointed out or not," and that was held, in the Graves case, to warrant a presentment which recommended that an officer be removed from office on finding misconduct for which he could have been, but was not, indicted. Parenthetically, in the later Interim Report case, the court distinguished the Graves case by explaining that the constable who was the subject of the presentment there, had previously been indicted. The opinion in the Graves case revealed that Graves had been indicted five years earlier for some offense or offenses not shown, but had never been brought to trial. In any event, the publisher, at the time of writing the editorials, would have no way of knowing that the Graves case could not be relied on, if indeed it could not. Moreover, both the earlier Owens and Ryon cases lent confirmation to the view that such presentments could be filed without being accompanied or followed by an indictment. More than that, the learned judge before whom that grand jury was impaneled had so charged them, in accordance with the statute. R. 293-4.[5] It must not be overlooked that when, after submission to him of the grand jury report or presentment the same circuit judge heard the motion to suppress, after the editorials were published, he felt (even knowing all that was in the report), as had the publisher (without knowing exactly what was therein), that the report or presentment in question could not be suppressed, and must be filed and he so ordered. That the circuit judge so concluded on the basis of the law as made by the earlier cases was recognized in the later Interim Report case opinion, where the Supreme Court said: "The assigned judge was of the opinion that the investigation and report were authorized under the decisions of this court in In re Report of Grand Jury [Graves case], 1943, 152 Fla. 154, 11 So.2d 316; Owens v. State, Fla. 1952, 59 So.2d 254; and Ryon v. Shaw, Fla. 1955, 77 So.2d 455, and declined to grant the State Attorney's motion to suppress the portion of the interim report in question."
Next, as to the matter of public interest and the degree of public interest in having such grand jury investigation reports or presentments made public. It has been shown above how the earlier cases appeared to place great emphasis on the benefit to the public, as being a paramount reason for such reports to be made public, and outweighing the plight of the official thus presented, even if the report slandered him and suggested him unfit to serve in his office. While a judge or a layman might well so conclude from the earlier cases, the later Interim Report case could not be so construed. The jury could accept the Interim Report case as holding that the interest of the official presented, if he is slandered and suggested unfit, is paramount to the interest which the public may have in knowing the facts and conclusions of the grand jury regarding such official from its investigation. Where, in Graves, the court had regarded the public interest in publishing such reports to surmount the inability of the official *730 presented to defend himself or be confronted by his accusers, in the later Interim Report case the court expressed at length the view that such a presentment, without indictment, was a fatal injury to an official because it could not be answered and defended and tried, clearly implying that the public interest was in the suppression of such a report, rather than in having it made public.
That change of view in the Interim Report case was of particular significance in the trial of this case, because where a judge or layman might reasonably see, from the prior decisions, a strong policy and need to make such reports public, and, therefore, reasonably conclude that the state attorney, as the prosecuting official, would be protecting officials presented therein who by law were not entitled to protection against publication of the report and would be going clearly against public need and interest, none of that could be assumed or concluded under the later Interim Report case.
Here again, it must be noted that the prejudicial effect of the introduction into evidence of the Supreme Court opinion in the Interim Report case does not hinge so much on what judges and lawyers may conclude as to whether and to what extent the latter case overruled the earlier cases or changed, revised or modified the law as stated in them, but rather whether one reasonably could have found in the earlier cases ground or reason upon which to base the assumptions and the opinions as to the rights and wrongs which were dealt with in the editorials, and whether, on the other hand, when shown the Interim Report opinion which to them then would be the last word of the Supreme Court of Florida, the jury would not feel compelled to conclude that the later Interim Report decision controlled and that it left no room for an attack on the action of the state attorney.
Second. A charge given to the jury in the case, dealing with the defense of fair comment, was erroneous and prejudicial such as to require a new trial. The charge was one requested by the plaintiff. It was objected to, and its use was challenged on motion for new trial, assigned as error and made the subject of argument in the appellant's brief.
The charge in question was as follows:
"If you find that the language in either or both of the editorials complained of is not free from the imputation of dishonorable or corrupt motives, then I charge you that the defendant has exceeded the bounds of fair comment and you should find for the plaintiff as to the defendant's liability arising from the publication of either or both of the editorials in question."
That charge told the jury that they should find for the plaintiff if they found that either of the publications contained an "imputation of dishonorable or corrupt motives." The charge made no exception. It imposed absolute liability if dishonorable or corrupt motives were imputed.
The error was in giving that charge in that absolute form, that is, as appellant points out, the charge was erroneous and prejudicial because it did not add, as the law provides, the exception that such imputations could be made within the orbit of fair comment, if they were based on true facts and warranted thereby.
The majority opinion does not reject appellant's contention that facts and circumstances may warrant such imputations, but approves the challenged charge by substituting and stating a different rule that "the defense (of fair comment) does not embrace the right to falsely impute one's motives, want of loyalty or misconduct in office." I find no contention of the appellant to the contrary of that proposition.
But the charge which is here singled out as constituting reversible error did not concern that rule. The validity of the *731 charge, and through it, of the trial, depends on whether a newspaper comment on an official's conduct[6] and regarding a matter of public interest,[7] which impugns the official's character and motives as the result of certain official conduct understood by the publisher to be a serious breach of his duty to the public, prompts absolute liability for libel because of such imputations, or whether there may, in law, be facts and circumstances which could warrant such imputations or opinions.
The approved rule is that comments or opinions criticizing public officials may contain imputations of corrupt or dishonorable motives, when such imputations are reasonably warranted by facts truly stated. See Myers v. Hodges, supra, 53 Fla. 197, 44 So. 357, 365; Merriman v. Lewis, 141 Fla. 832, 194 So. 349; Kennett v. Barber, 159 Fla. 81, 31 So.2d 44, 46; Brinkley v. Fishbein, 5 Cir., 1940, 110 F.2d 62, 64; Potts v. Dies, 1942, 77 U.S.App.D.C. 92, 132 F.2d 734; De Savitsch v. Patterson, 1946, 81 U.S.App. D.C. 358, 159 F.2d 15, 16-17; Caldwell v. Crowell-Collier Pub. Co., 5 Cir., 1947, 161 F.2d 333, 336; Golden North Airways v. Tanana Publishing Company, 9 Cir., 1954, 218 F.2d 612, 627; Reynolds v. Arentz, D.C.Nev. 1954, 119 F. Supp. 82, 86; Howard v. Southern California Associated Newspapers, 1950, 95 Cal. App.2d 580, 213 P.2d 399; Sheehan v. Tobin, 1950, 326 Mass. 185, 93 N.E.2d 524, 529; Griffin v. Opinion Pub. Co., 1943, 114 Mont. 502, 138 P.2d 580; Leers v. Green, 1957, 24 N.J. 239, 131 A.2d 781, 789; Mick v. American Dental Association, 1958, 49 N.J. Super. 262, 139 A.2d 570, 580; Cohalan v. New York Tribune, 1939, 172 Misc. 20, 15 N.Y.S.2d 58; Shenkman v. O'Malley, 1955, 1 Misc.2d 794, 147 N.Y.S.2d 87, 90; Cheatum v. Wehle, 1957, 6 Misc.2d 988, 167 N.Y.S.2d 839, 841, modified and affirmed 5 A.D.2d 448, 172 N.Y.S.2d 62; Owens v. Scott Publishing Company, 1955, 46 Wash.2d 666, 284 P.2d 296, 303; 53 C.J.S. Libel and Slander § 131 (3); III Restatement, Torts, §§ 606, 607; Gatley, Libel & Slander, pp. 344-356 (4th ed. 1953); Newell, Slander & Libel, § 485 (4th ed. 1924); Salmond, The Law of Torts, § 138 (11th ed. 1953); Green, The Right to Communicate, 35 N.Y.U.L.Rev. 903, 911 (1960); Hallen, Fair Comment, 8 Texas L.Rev. 41, 75 (1929); Harper, Privileged Defamation, 22 Va.L.Rev. 642, 660-662 (1936); Smith, Charges Against Candidates, 18 Mich.L.Rev. 1, 104 (1919); Veeder, Freedom of Public Discussion, 23 Harv.L.Rev. 413 (1910); Yankwich, The Protection of Newspaper Comment on Public Men and Public Matters, 11 La.L.Rev. 327, 339 (1951); Developments in the Law: Defamation, 69 Harv.L.Rev. 875, 926 (1956); Note, 62 Harv.L.Rev. 1207, 1210 (1949). See also, Peter Walker & Son, Ltd. v. Hodgson [1909] 1 K.B. 239, 253.[8]
*732 Moreover, it should be noted that fair comment can include language which is severe and denunciatory if related to the acts of the person and germane to the subject and circumstances involved. See Golden North Airways v. Tanana Publishing Company, supra, 9 Cir., 1954, 218 F.2d 612, 626-629, and cases there cited; Beauharnis v. Pittsburgh Courier Publishing Co., 7 Cir., 1957, 243 F.2d 705, 708; Caldwell v. Crowell-Collier Pub. Co., 5 Cir., 1947, 161 F.2d 333, 336; Mick v. American Dental Ass'n, supra, 49 N.J. Super. 262, 139 A.2d 570, 580; Catalfo v. Shenton, 102 N.H. 47, 149 A.2d 871, 873. See also, Boyer, Fair Comment, 15 Ohio St.L.J. 281, 293 (1954); Goodhart, Restatement of the Law of Torts, Vol. III: A Comparison Between American and English Law, 89 Pa.L.Rev. 265, 289 (1941); Noel, Defamation of Public Officers and Candidates, 49 Col.L.Rev. 875, 880 (1949); comment, 12 Miami L.Rev. 89, 98 (1957); note, 62 Harv.L.Rev. 1207, 1215-1216 (1949). Cf. England v. Daily Gazette Company, 143 W. Va. 700, 104 S.E.2d 306.
The erroneous charge, which was predicated on absolute liability upon any imputation of corrupt or dishonorable motives, was not rendered harmless by all or any other of the charges given by the court to the jury. All charges on the subject of fair comment, as well as the entire charge of the court have been examined. Included in the portion of the charge relating to fair comment, and preceding the charge here quoted, was one which also said that imputation of "corrupt and dishonorable motives" would be actionable, with no exception stated. Again, it was charged flatly that "comment going so far as to attack personal character or to impute immoral or corrupt motives is unfair and not privileged." Thus, the other charges relating to the defense of fair comment contained nothing to relieve the error but rather they compounded it.
Whether or not there were circumstances and facts truly stated such as to warrant the criticism which the publications contained, should have been made a question for the jury on a proper charge.
Third. This case demonstrates that a newspaper editorial, criticizing the conduct of a public official on a matter of public interest, which may have been justified and not libelous under the law when published, can be made to appear as an obvious and wanton libel under the terms and pronouncements of some judicial decision which may cast a different light on the matter dealt with, rendered afterward[9] and in a proceeding entirely collateral to the publisher and which in practical effect is ex parte. Therefore, what appears to have been overlooked in this case is that the use of the pronouncements of an appellate court made in such a subsequent proceeding, to assure liability and exact punitive damages[10] for a publication which may have been justified *733 and proper when made, can be a means of intimidation and control of the press by judicial process,[11] in the face of the guarantee supplied by the Constitution of the United States against such. For that reason, there is presented here a question which far transcends in importance the struggle of these parties over the money involved in this instance.[12]
That basis on which this case was tried, and the erroneous charge, each operated to strip from the defendant its shield of fair comment, and thereby to withhold from it freedom of speech and of the press, in violation of the First and Fourteenth Amendments[13] to the Constitution of the United States by denying, to defendant, due process of law.

On Petition for Rehearing
PER CURIAM.
The petition of appellant for rehearing, directed to the opinion and judgment herein filed March 9, 1961, having been considered is hereby denied by the court; Chief Judge HORTON and Judge PEARSON concurring, with Judge CARROLL noting his dissent "for reasons stated in the filed dissenting opinion in this case."
NOTES
[1] Miami Herald Publishing Co. v. Brautigam, Fla. 1960, 121 So.2d 431.
[2] Newspapers are not held to the same degree of care in reproducing outside press dispatches as they are in publishing original items. Absent a showing of any recklessness or carelessness, the mere reproduction by a newspaper of actually false but apparently authentic news dispatches from generally recognized reliable sources, does not, through publication alone, render the publication per se actionable.
[1] State ex rel. Brautigam v. Interim Report of Grand Jury, Fla. 1957, 93 So.2d 99. The editorials involved in the libel action were published on April 28 and April 30, 1956. The decision in the Interim Report case was rendered February 27, 1957. The libel action was filed March 21, 1957, and the trial commenced February 8, 1958.
[2] The conclusion of the grand jury as expressed in the presentment was referred to and stated by the Supreme Court in the Interim Report case (93 So.2d at page 101), as follows: "The jurors conclude that `[i]n view of the disregard of the law, in view of the squandering of assets of an estate and the allowance of exorbitant fees, in view of the connivance of the Court and its appointees, and in view of conduct unbecoming Judges and members of the Dade County Bar,' the circuit judges in question were `unfit to serve and should resign from office' and the lawyers in question were `unfit to practice law and to perform the functions of officers of the court.' They called upon the Board of Governors of The Florida Bar and the Grievance Committee for the Eleventh Judicial Circuit of The Florida Bar `to review the conduct of the participants in this case with a view to disciplinary action and disbarment.'"
[3] When the grand jury submitted the report for filing on Thursday, April 25, 1956, the court acceded to an oral request of the state attorney to hold up the filing thereof until he could prepare and submit a written motion to suppress it, and the court set a hearing thereon for Monday afternoon, April 30, 1956, at which time, after hearing, the circuit court ruled, on the basis of the prior decisions relating to grand jury presentments, that the report was entitled to be filed, and denied the motion to suppress. The two editorials were published in the interval, while the filing of the report was temporarily held up, on the mornings of April 28 and April 30, 1956. Thus while the Interim Report case (93 So.2d 99) dealt with the right of the grand jury to file the very report which was involved here, and with whether there is a public interest to be served in that connection, that appeal was a matter in which The Miami Herald Publishing Co. was not a party and the proceeding was a collateral one as far as the publisher was concerned, the appeal being one by the State Attorney as the appellant against the interim report as the appellee.
[4] In the Graves case the presentment was severe. The report stated the constable had (1) permitted gambling, (2) used helpers with criminal records and gambling connections, (3) misused his position to exert duress on businessmen, and (4) improperly used his power to employ and handle deputies; and then without bringing in an indictment, recommended that the constable be removed from office. The Supreme Court held the official was not entitled to have that report against him expunged, but the court did expunge a conclusion expressed by the grand jury which, stated in the vernacular, was to the effect that they did not indict him because they felt he would beat the rap.
[5] "The grand jury is an investigative and inquisitorial body. It does not try cases or render verdicts. It investigates crimes and other matters and conditions which affect the morals, the health, the safety and the general welfare of the people of the county. It is the guardian of the rights of the people. It is a branch of the government to which a citizen can appeal for aid when public officers and employees who are charged with the administration and enforcement of the laws of the State refuse or fail to discharge faithfully their duties.

"As I have indicated, you are not required to limit or restrict your investigations to crime. You may also make presentments and reports as to other matters and conditions which affect the public morals, health, safety or general welfare. You may investigate state, county and municipal officers and recommend their removal or recall for malfeasance, misfeasance, neglect of duty, incompetence or other official misconduct although no indictable criminal offense is involved."
[6] The invitation to criticism which the holding of public office produces was commented on by the Supreme Court of Florida in White v. Fletcher, Fla. 1956, 90 So.2d 129, 131, as follows:

"As expressed by Mr. Justice Terrell in Kennett v. Barber, 159 Fla. 81, 31 So.2d 44, 46, this Court held:
"`We think the rule is now generally accepted that any one who seeks public employment or public office or who makes his living by dealing with the public or otherwise seeks public patronage, submits his private character to the scrutiny of those whose patronage he implores, and that they may determine whether it squares with such a standard of integrity and correct morals as warrants their approval.' (Emphasis added.)"
[7] The reference made in Crowell-Collier Pub. Co. v. Caldwell, 5 Cir., 1948, 170 F.2d 941, 943, to the susceptibility to critical comment of matters of public interest, is applicable here:

"* * * That there is a qualified privilege to publish matters affecting the interest of the general public, there is no doubt, nor any that the publication in this case had to do with such matters."
[8] In some jurisdictions the privilege even is extended to the publication of false assertions of fact about official conduct of public officers if made in good faith and without malice. See, e.g., Howser v. Pearson, D.C. 1951, 95 F. Supp. 936; Charles Parker Company v. Silver City Crystal Co., 1955, 142 Conn. 605, 116 A.2d 440; Clancy v. Daily News Corporation, 1938, 202 Minn. 1, 277 N.W. 264; Yancey v. Gillespie, 1955, 242 N.C. 227, 87 S.E.2d 210; Bailey v. Charleston Mail Ass'n, 1943, 126 W. Va. 292, 27 S.E.2d 837, 150 A.L.R. 348.
[9] "`The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. * * *'

"The fundamental freedoms of speech and press have contributed greatly to the development and well-being of our free society and are indispensable to its continued growth. Ceaseless vigilance is the watchword to prevent their erosion by Congress or by the States. * * *" Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498, 1509.
See also, Grosjean v. American Press Company, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660, 668.
[10] The punitive damages included in the verdict can be attributed to introduction into evidence of the later Interim Report decision, as absence of personal malice was conceded. This is so because the jury was told, by the Interim Report case opinion, that the conduct of the state attorney, far from deserving the severe criticism which the publisher thought it merited, was proper and highly commendable.
[11] Judicial action is state action within the contemplation of the Fourteenth Amendment. See, e.g., Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664; Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, 3 A.L.R.2d 441; Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586.
[12] Thus a vital federal question emerges [Garland v. Torre, 2 Cir., 1958, 259 F.2d 545, 548; Tribune Review Pub. Co. v. Thomas, D.C.W.D.Pa. 1954, 120 F. Supp. 362, 369] regarding the denial of defendant's privilege of critical fair comment. See Julian v. American Business Consultants, 2 N.Y.2d 1, 155 N.Y.S.2d 1, 10, 137 N.E.2d 1; Hall, Preserving Liberty of the Press by the Defense of Privilege in Libel Actions, 26 Cal.L.Rev. 226 (1938). Cf. Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919.
[13] The Fourteenth Amendment restrains the state from denying freedom of the press. See, e.g., Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Smith v. People of State of California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205.