### MORRELL, et ux v. CAPITAL INDEMNITY INS. CO., et al.
No. 60-L-1746.

Circuit Court, Dade County.

May 1 and September 16, 1961.

Robert J. Beckham, Allan F. Milledge and Alan R. Schwartz of Nichols, Gaither, Beckham, Colson & Spence, Miami, for plaintiffs.

Henry L. Balaban and L. J. Cushman, both of Miami, for defendant Capital Indemnity Ins. Co.

Wallace N. Maer, Miami, for defendants Murray Goldberg and Charlie Curry.

PHILLIP GOLDMAN, Circuit Judge.

*Final judgment, May 1, 1961:* This cause, coming on to be heard before the Honorable Phillip Goldman, one of the judges of the above-styled court, and a jury of six true and lawful men, who, having been first duly sworn according to law, and having heard the evidence, the arguments of counsel, and the charges of the court, and having retired to consider their verdict, returned in open court the following verdict, to-wit:

"We, the jury, find for the plaintiff, George Palmer Morrell, and assess his compensatory damages in the sum of Eighteen thousand ($18,000) dollars and assess his punitive damages against Capital Indemnity Insurance Company in the sum of Seventy-five thousand ($75,000) dollars; and assess his punitive damages against Murray Goldberg in the sum of Twenty thousand ($20,000) dollars; and assess his punitive damages against Charlie Curry in the sum of One thousand ($1,000) dollars.
So say we all

*Dudley Cawthon*
Foreman
Dated: 4/28/61"

It is therefore ordered and adjudged that final judgment be and it is hereby entered in said cause in favor of the plaintiff, George Palmer Morrell, and against the defendants, Capital Indemnity Insurance Company, Murray Goldberg and Charlie Curry, and the plaintiff, George Palmer Morrell, shall have and recover from the defendants as follows: for compensatory damages against Capital Indemnity Insurance Company, Murray Goldberg and Charlie Curry, the sum of $18,000; for punitive damages against Capital Indemnity Insurance Company, the sum of $75,000; for punitive damages against Murray Goldberg, the sum of $20,000; and for punitive damages against Charlie Curry, the sum of $1,000, lawful money of the United States of America.

Costs to be hereafter taxed.

*Opinion and order on post trial motion of defendant Capital Indemnity Insurance Company, September 16, 1961:* By way of background, this was an action by George Palmer Morrell and his wife against Capital Indemnity Insurance Company, Murray

Goldberg and Charlie Curry for false imprisonment, embracing claims for punitive as well as compensatory damages. At the close of all evidence the court denied the corporate defendant's motion (as well as the other defendants' motion) for a directed verdict as to the plaintiff husband[1] and granted the plaintiff-husband's (hereafter referred to by name or as the plaintiff) motion for a directed verdict on the issue of whether the plaintiff had been falsely imprisoned.

Issues relating to the amount of compensatory damages, if any, whether or not punitive damages should be assessed and if so, against whom and the amounts thereof, were all submitted to the jury with appropriate instructions. Thereafter the jury returned a verdict for compensatory and punitive damages in favor of the plaintiff and against all of the defendants. The punitive damage award varied as to each of the defendants.

The cause is presently before the court on the defendant Capital Indemnity Insurance Company's post trial motion for judgment or, in the alternative, for a new trial.

Although containing some fifteen grounds, the principal thrust of Capital Indemnity's post trial motion is that the court erred in denying *its* motion for directed verdict and in granting plaintiff's motion *insofar as it held this defendant responsible for the actions of the individual defendants.* This contention is premised upon the claim or assertion that defendants Goldberg and Curry lacked the "authority" to act for this defendant in the *manner* that they did.

Analysis of the propriety of the court's action here under attack requires inquiry into the nature and elements of the cause of action popularly referred to as "false imprisonment".

In 14 Fla. Jur., False Imprisonment, §3, p. 287 (with supporting cases collected in the notes), the essential elements of this action are set forth as follows —

> *"The gist of false imprisonment is the unlawful detention of a person and the deprivation of his liberty contrary to his will.* The restraint must be unreasonable and not warranted by the circumstances. And it must be accomplished either with the intention of causing a confinement or with knowledge that confinement to a substantial certainty will result. *It is not necessary, however, to show that the defendant was prompted by malicious motives.*

---

1. The plaintiff wife took an involuntary non-suit in the face of the court's announced intention to direct a verdict in defendants' favor as to her.

"There need be no confinement in a jail or prison. Nor is it necessary that the defendant be the party who takes the plaintiff into custody. *Liability may be imposed on a person procuring a restraint without legal authorization, through the agency of peace officers or others.*" (Italics added.)

At the risk of being dogmatic, the evidence that the plaintiff George Morrell was falsely imprisoned stands uncontradicted.

In fact, the corporate defendant, with commendable candor, conceded at the hearing on its post trial motion that the actual imprisonment of the plaintiff was unlawful or without lawful authority, premising its claim of immunity from liability (as previously noted) upon principles of agency.[2]

It is equally clear that the undisputed evidence does not support the corporate defendant's belated claim of immunity. For example, the evidence was undisputed — that the bond was written on behalf of the corporate defendant; that its name appeared upon the bond; that *the defendant Goldberg was its agent at the time and, in that capacity, was given the corporate seal, and all other indicia of authority; that the company's confidence in Goldberg was such that, as to him, it had waived its requirement that agents send copies of bonds which they write to the home office;* that the company received its regular premium from the writing of the subject bond (which was not returned) ; that *at the time the false imprisonment took place, Goldberg was the agent for the company in discharging its outstanding bonds* (one of which was the bond in question) ; that *the capture and surrender of principals on its outstanding bonds was a normal method of discharging the company's obligations;* and that *the method of discharging the company's obligations on bonds was left entirely to the discretion of its agent Goldberg.*

In addition, through one of its general agents, long before it was "misused" as an "arrest warrant", the company had *actual* knowledge that the particular bond in question was not a bail bond and it made no attempt to either void the bond or return the premium. Further, it was the corporate defendant which stood to gain from the actions of the individual defendants.

It might also be noted that although the vice president of the company testified that he personally did not learn any of the facts of the case until the complaint was filed in March of 1960,

---

2. This fact is noted because at the trial this defendant's sole and only defense to the plaintiff's motion for a directed verdict (on the issue of primary — or non-punitive — liability), was the claimed lawfulness of the capture and imprisonment of the plaintiff.

he further testified, after sitting through the entire trial that the methods used were ordinary procedures and *he was not shocked by the treatment of Morrell in the instant case.*

It is incomprehensible to the court (and the court has been shown no authorities so holding) that a principal may unleash a "tiger" in the street with full authority to act for it (as outlined above), close its eyes, and then deny liability because it did not *specifically* direct, suggest or authorize the *particular* steps which the "tiger" took in the principal's behalf. This is especially true where the principal, upon learning what had occurred, was not shocked by the actions taken in its name and behalf.

At this juncture it would seem appropriate to point out that the corporate defendant (throughout its brief) in support of this (and other of its contentions) argues that this case is governed by the law of Ohio (not Florida) and that Ohio law could lead to a different conclusion.

The court has examined and must reject this argument. In the first place the court is not at all certain that the law of Ohio is controlling to the exclusion of the law of Florida. Nor is it clear that "Ohio law" would require a different result. However, it is not necessary to decide this point because none of the defendants offered any evidence as to the law of Ohio. Nor did any of them establish the necessary statutory predicate for the court to take judicial notice of the law of Ohio, assuming that this could be done even with a proper predicate. And, equally important, at no time (prior to the post trial hearing) did any of the defendants ever contend or argue that the law of Ohio applied.

The gravamen of defendant's defense at the trial (on the issue of liability)[3] was that the plaintiff was a "scoundrel" (which seemingly, in their view, deprived him of all constitutional rights); that they were not personally angry with the plaintiff nor did they bear him malice; and that they simply had a job to do which they were doing.

Whatever else may be said, this does not render lawful an otherwise unlawful detention against one's will. Such defense may, of course, relate to the issue of "malice, wantonness or outrageous disregard of plaintiff's rights and liberties", insofar as punitive or exemplary damages are concerned. This issue admittedly was for the jury and it (among others) was so submitted.

---

3. Aside from its defense that the imprisonment was lawful, which defense was rejected by the court at the trial and abandoned by this defendant in its argument on the post trial motion.

The corporate defendant also strongly urged at the post trial argument its ground that a new trial must be granted because punitive damages against it cannot, *as a matter of law*, be greater than the punitive damages awarded against the individual defendants.

Not only does the court find no foundation in law for this contention, but it runs completely contrary to the entire concept of punitive or exemplary damages. See 9 Fla. Jur., Damages, §114, et seq.

Moreover, the *court's charge* to the jury (*made without objection*) with respect to the elements to be considered in arriving at punitive damages, if any, *contemplated the likelihood of an award of varying amounts as against the several defendants.*

Furthermore, the *form of the verdict, which was expressly approved by counsel for the parties,* contemplated the likelihood of awards of punitive damages in varying amounts, if the jury was inclined to award any such damages. Notwithstanding a change in counsel, it would seem to be a little late for this defendant to alter its position on this matter.

There is one other point advanced by the defendant which the court deems worthy of comment — although not argued at the hearing, the corporate defendant vigorously contends in its brief that a new trial should be granted because of alleged improper argument by plaintiff's counsel. Aside from the fact that the court finds this contention totally without merit, it is apparent that *at no time did counsel for this defendant (or counsel for any of the other defendants) object.*

This defendant argues that an objection was not necessary, citing Bullock v. Branch, Fla. App., 130 So. 2d 74. Assuming the argument here was improper, as in the cited case, the defendant overlooks, or fails to appreciate, that the cited case relates to (and excuses) a failure to "request an instruction to disregard" *at the precise time* that the improper argument was made. In that case an objection was made.

Admittedly, there are cases holding that an objection at the precise time is unnecessary "where the conduct complained of runs through the trial". However, the claimed objectionable argument is generally brought to the court's attention before the parties leave the court house and return home. The point is that no one thought the argument here improper until *additional counsel* (who never *heard* the argument) was retained and a motion for new trial was filed some ten days later.

Aside from the foregoing, the court, under the circumstances here, does not consider the argument in question improper. In the first place considerable leeway in argument must be allowed in a "punitive damage" case because " . . . Such damages are awarded as a punishment to the defendants and as a warning and example to deter them and others from committing similar acts in the future." It would therefore seem to necessarily follow that it is proper to argue (if within the scope of the evidence) as to whether or not there is a need to deter the defendant and others from committing similar acts in the future.

In any event, this defendant's counsel argued (and his argument *preceded* that portion of the plaintiff's argument under attack) the "other side of the coin" and he did so with such skill, passion and zeal that the representatives of the corporate defendant and the individual defendants themselves (who for some unexplained reason, pursuant to a vaguely alluded to agreement between the defendants, voluntarily gave their final argument time to the corporate defendant)[4] rushed over to congratulate him.

If there was any impropriety in plaintiff's argument, it was certainly provoked.

In the court's judgment the trial here was as free from error as a vigorously contested trial is likely to be.

The jury[5] heard the evidence and, equally important, observed the witnesses. This, of course, is always an important consideration but in a case such as this, particularly on the issue of punitive damages, the appearance, attitude and demeanor of witnesses is of even greater import.

The transcript here, for example, cannot possibly recapture the atmosphere of the trial as it existed when the vice president of the corporate defendant testified (after hearing the entire revolting story unfold in the courtroom) that he wasn't shocked by anything he had heard with regard to the treatment of the plaintiff, Mr. Morrell; that his company had gotten its money out of the case and they had kept the premium because they had earned it.

---

4. This rather strange (though by no means improper) occurrence, coupled with the overall conduct of the defense, indicates who was in command of the defense, and casts further doubt upon the corporate defendant's "agency argument" heretofore discussed.

5. The jury here was composed of a truly representative group, including at least one prominent business man and a member of one of Florida's most respected families (the Cawthons) who was the foreman.

Nor can the transcript recapture the courtroom atmosphere as the defendants time and again either testified, or elicited testimony from their witnesses, to the effect that the methods and procedures used in capturing and surrendering the plaintiff Morrell were not unusual but were the ordinary procedures which they generally employed.

There is little to be gained by detailing the evidence which the jury was entitled to believe — the guns, the chains, the deceit, the incarcerations. Suffice it to say that it adds up to one of the most frightening and outrageous invasions of the rights of man that it has ever been this court's misfortune to hear[6].

In the court's judgment, the evidence here was more than ample to support the jury's determination (inherent in its verdict) that the defendants' actions were committed with malice, wantonness or outrageous disregard of the plaintiff's rights and liberties. If this defendant's conduct was not malicious and intentional, it was, at a bare minimum, of such a gross and flagrant character as to demonstrate a conscious and reckless indifference to consequences involving the rights of others. See generally 9 Fla. Jur., Damages, §122 et seq., pp. 456-457.

As for the amount of the verdict, it was for the jury to assess damages (compensatory and punitive) within the framework of the evidence and the court's instructions. This it did and the court has neither the inclination, nor can it find legal justification, to substitute its individual appraisal for the composite judgment of the six truly representative reasonable men who served as jurors in this case.

The jury's verdict was well within the ambit of its discretion. See Re-Mark Chemical Co. v. Ross, Fla. App., 101 So. 2d 163; Coast Cities Coaches, Inc. v. Donat, Fla. App., 106 So. 2d 593; Cf. Miami Herald Publishing Co. v. Brautigam, Fla. App., 127 So. 2d 718, 724.

The court is unable to find merit in any of the grounds asserted by the corporate defendant which would warrant entering judgment for it or granting it a new trial. It is accordingly ordered and adjudged that the motion of the defendant Capital Indemnity Insurance Company for the entry of a judgment in its favor or for a new trial be and the same is hereby denied.

*Order denying motions for new trial filed on behalf of defendants Goldberg and Curry, September 16, 1961:* This cause came on for hearing upon the motion of the defendants, Murray Gold-

---

6. A transcript of this trial should be required reading for all who may complacently say — "It can't happen here!!"

berg and Charlie Curry, for a new trial. Here, *as at the trial*, these defendants did not choose to argue. However, at the suggestion of the court a brief was filed in support of the motion. The court has carefully examined the brief and motion and is unable to find merit in any of the grounds asserted which would warrant the granting of a new trial.

As noted in the court's order addressed to the post trial motion of the corporate defendant, the trial here was as free from error as any vigorously contested trial is likely to be. The jury (as also pointed out in the court's companion order) was composed of a truly representative group of reasonable men, including at least one prominent businessman and a member of one of Florida's most respected families. They settled the issues submitted to them and the court does not find any basis for invading their province. Certainly the evidence was considerably more than ample to support the verdict.

It is accordingly ordered and adjudged that said motion be and the same is hereby denied.