## CALDWELL v. CROWELL-COLLIER PUB. CO.
### No. 11798.

Circuit Court of Appeals, Fifth Circuit.

April 21, 1947.

Rehearing Denied June 5, 1947.

---

334

Julius F. Parker, John T. Wigginton, Leo L. Foster, and T. T. Turnbull, Jr., all of Tallahassee, Fla., for appellant.

Chester H. Ferguson, of Tampa, Fla., for appellee.

Before SIBLEY, and LEE, Circuit Judges, and STRUM, District Judge.

SIBLEY, Circuit Judge.

The appellant Millard F. Caldwell, a citizen of Florida, sued appellee Crowell-Collier Publishing Company, a corporation of Delaware, for a sum largely exceeding $3,000 for an alleged libel published February 23, 1946, in the magazine called "Colliers" which was circulated throughout the State of Florida, the United States, and the world. The complaint was dismissed on motion, the district judge holding that it did not state a case of libel per se, that no special damages were alleged to sustain it as a libel per quod, and that it appeared that the publication complained of was privileged. The plaintiff appeals to this court.

The allegations, much condensed, are that Caldwell was and is the Governor of the State of Florida, that the publication complained of is an editorial as follows:

"Two Governors on Race Problems."

"About a year ago a fourteen year old negro broke into a Wilmington, North Carolina, house, raped a pregnant woman, was caught the next day, confessed, and was sentenced to death. Recently Governor Cherry of North Carolina commuted the colored boy to life imprisonment, remarking in part: 'The crimes are revolting, but a part of the blame arises from the neglect of the State and Society to provide a better environment * * *.' "

"In Florida a few months ago, a negro under indictment for attempted rape was snatched from jail by a mob and shot to death. Governor Millard Caldwell of Florida said he did not consider this a lynching. He went on to opine that the mob had saved courts, etc., considerable trouble, and added:

" 'The ordeal of bringing a young and innocent victim of rape into open court and subjecting her to detailed cross-examination could easily be as great an injury as the original crime. This fact probably accounts for a number of killings which might otherwise be avoided.'

"Thus Cherry of North Carolina expresses the forward-looking view of these matters, while Caldwell of Florida expresses the old narrow view which has been about as harmful to southern white people as to southern negroes. We can only congratulate North Carolina on its governor and hope that Florida may have similar gubernatorial good luck before long."

Further allegations are that it was not true that the negro was snatched from jail by a mob; that the statement that the Governor said he did not consider this a lynching was a distortion, imputing that the Governor did not disapprove the killing, while what he said was that it was murder, and not a lynching because there was no evidence of mob action; and that he "opined the mob had saved the courts considerable trouble" was wholly untrue; the direct quotation was an isolated excerpt from a letter, the whole letter being exhibited, which quoted a public statement that a grand jury had investigated the killing, had failed to fix the guilt, but exonerated the sheriff; that the Governor had sent a special investigator who reported the sheriff did not participate in the crime; that the Governor thought nevertheless the sheriff by his stupidity and ineptitude had showed his unfitness for office, but he was duly elected by the people of the county and not subject to removal for this cause by the Governor, but the Governor now served notice on the officials of Florida that the highest degree of care would be expected; there followed an expression in the letter of the writer's personal opinion that the killing was not a lynching; and the reference to the ordeal of a trial as respects the young victim (said to have been a child of five years); and an ex-

pression of determination to awaken the citizens of the counties to feel responsible for the officials they elect; and an intention to stimulate the people to action and make democracy work.

Further allegations are that on February 13, 1946, the plaintiff learned of the editorial about to be printed, and he telegraphed the publisher, the editor, and the managing editor, calling attention to the false statements and inferences in the editorial and the damage it would do him, and requesting that it be not published, but nevertheless it was wickedly and maliciously published, intended to and having the effect of injuring him in his good name, fame, and creed, and bringing him into contempt and ridicule before the people of Florida and the United States. It is alleged that plaintiff was before his election as Governor a practicing attorney at law in general practice, that he had been active in politics, serving in the Legislature of Florida and in the Congress of the United States, that the editorial gave the impression that a lynching had occurred in Florida while he was Governor, and that he had condoned it, and had approved the action of a mob in taking a negro from the protection of the law and killing him, to the great damage of the plaintiff's reputation both personal and professional, and that it was done for the purpose of casting contempt and ridicule upon plaintiff and discrediting him in the eyes of the public and the electorate, and that the editorial was calculated to create the impression that he had condoned and approved lax law enforcement and lynch law.

Lastly it is alleged that more than five days before suing plaintiff had in writing pointed out to defendant the editorial and the statements therein considered false and defamatory, and stated his intention to sue, as required by Florida statute, F.S.A. § 770.01, but no apology, retraction or correction has been made.

We think a case of libel is alleged. Publication is averred in Florida and throughout the United States, but the injury must have occurred mainly in Florida where the plaintiff resides and holds office, and the law of Florida is principally to be regarded. We observe, however, no sub-

stantial difference between the law of Florida and that of other common law States. A libel is a compound of written falsity and malicious publication, but the falsity may consist in untrue imputation as well as direct statement, and malice may be inferred from the nature of the charges made as well as from the circumstances. False imputations may be actionable per se, that is in themselves, or per quod, that is on allegation and proof of special damage. 33 Am.Jur., Libel and Slander, § 5; Commander v. Pederson, 116 Fla. 148, 156 So. 337; Johnson v. Finance Acceptance Co., 118 Fla. 397, 159 So. 364. No special monetary or other damage is here alleged, so the question is, Are the false imputations libelous per se? Imputation of a crime is not present. But it is enough, if the natural or necessary result of the imputation is to hold one up to public hatred, contempt or ridicule, 33 Am.Jur., Libel and Slander, § 45; or to prejudice him in his profession, office, occupation or employment, Id. § 63, and more particularly in his public office, § 79. In Briggs v. Brown, 55 Fla. 417, 46 So. 325, 330, the law is thus stated:

"A civil action for libel will lie when there has been a false and unprivileged publication by letter or otherwise which exposes a person to distrust, hatred, contempt, ridicule, or obloquy, * * * or which has a tendency to injure such person in his office, occupation, business, or employment. If the publication is false and not privileged, and is such that its natural and proximate consequence necessarily causes injury to a person in his personal, social, official, or business relations of life, wrong and injury are presumed and implied, and such publication is actionable per se."

This is repeated in Land v. Tampa Times Pub. Co., 68 Fla. 546, 67 So. 130; McClellan v. L'Engle, 74 Fla. 581, 77 So. 270; McCrary v. Post Pub. Co., 109 Fla. 93, 147 So. 259; Tip Top Grocery Co., v. Wellner, 135 Fla. 518, 186 So. 219; Metropolis Co. v. Croasdell, 145 Fla. 455, 199 So. 568. The imputations here do not appear to be such as would affect the plaintiff as an attorney, if he were now practicing, but they would naturally affect him in his office as Governor. The Florida Constitution, Art. IV,

Sect. 6, imposes on the Governor the sworn duty of seeing that the laws are faithfully executed. Art. XVI, Sect. 2, prescribes the form of oath. The Declaration of Rights, Sect. 11, guarantees to every person accused of crime a speedy and public trial by an impartial jury. Art. III, Sect. 29, makes the Governor subject to impeachment for "misdemeanor in office". Misdemeanor in the constitutional sense means simply misconduct, not necessarily indictable. State v. Borowsky, 11 Nev. 119; State v. Hastings, 37 Neb. 96, 55 N.W. 774. If the imputations published hold the Governor up as indifferent to a lynching in his State, or condoning it, and approving the work of the mob as saving trouble to the courts, they greviously reflect on him in his office, and if false and unprivileged are actionable per se, injury and damage being implied.

■ We have compared the picture made by the editorial with that presented by the public statement by the Governor included in the letter from which an excerpt was quoted. One picture is almost the reverse of the other. The quotation is a correct one in itself, but the letter as a whole shows that so far from condoning lynching in general or this killing in particular which the Governor did not think properly to be called a lynching since no mob apparently was involved, he strongly censured the sheriff for stupidity and ineptitude, but did not feel justified in removing him, and warned all officers against any future laxness. It is not necessary that the false charge be made in a direct manner, if the words in their ordinary meaning convey it, and an insinuation is as actionable as a positive assertion if the meaning is plain. 33 Am.Jur., Libel and Slander, § 9. A jury might well conclude that the Governor was being held up as unfaithful to his office by reason of facts falsely stated and implied in the editorial.

■ But it is argued by appellee that what "Colliers" published is a substantial reproduction of what it is alleged the magazine "Time" had said in its issue of Jan. 7, and that a newspaper may reproduce without liability news from a reliable source which cannot well be verified. Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 86 A.L.R. 466. The Layne case had to do with an Associated Press news item in a daily paper. Here we have a deliberate magazine editorial, made on the editor's own responsibility. If he relied on "Time," it is also alleged that "Time," when its attention was called to the incorrectness of its publication, had on February 4 published a full retraction and apology, of which the editor of "Colliers" could easily have known.

■ More broadly it is argued that since the publication related to a public officer and was by the public press, there is a qualified privilege which excuses it. Free speech and free press are an established part of our democratic institutions, but both are limited by the law of slander and libel. By word and by pen the official record and pronouncements of a public man may be discussed and criticised, condemned and even vituperated, but the facts cannot be perverted with impunity. Several of the Florida cases above cited were between public officers and newspapers. An earlier one is Jones, Varnum & Co. v. Townsend, 21 Fla. 431, 58 Am.Rep. 676. See also Nevada State Journal Co. v. Henderson, 9 Cir., 294 F. 60. But we need not at present further discuss this asserted privilege, because the complaint alleges malice in fact, and privilege is never an effective cloak for malice. Abraham v. Baldwin, 52 Fla. 151, 42 So. 591, 10 L.R.A.,N.S., 1051, 10 Ann. Cas. 1148; Coogler v. Rhodes, 38 Fla. 240, 21 So. 109, 56 Am.St.Rep. 170. This allegation is supported, too, by the alleged fact that attention was called to the falsity of the intended publication but it was proceeded with. Also under the Florida statute, F.S.A. § 770.01, notice of the intended suit was given so that a retraction might be made to limit damages to actual loss, if any, but no retraction was made. See Metropolis Co. v. Croasdell, supra. Privilege and want of malice should await final decision on the trial.

The judgment is reversed and the cause is remanded for further consistent proceedings.

Reversed.