## Commonwealth v. Acquaviva

286

*Frank Lawley, Jr.*, Deputy Attorney General, for Commonwealth.

*John D. Ray, Don Hanni* and *Alfred Papa*, for defendants.

LAUB, J., Specially Presiding, March 20, 1958.— After 10 days of trial, defendants were found guilty by a jury of both conspiracy to violate, and the actual violation of section 415 of The Penal Code of June 24, 1939, P. L. 872, 18 PS §4415. Although motions for a new trial were presented by defendants, these have been withdrawn, defendants conceding that the trial was error free. Defendants also agree that if the statute under which they were convicted is valid, their convictions were proper. They contend, however, in two helpful and enlightening briefs filed by their counsel, that the basic act is vague and uncertain and, in consequence, is in violation of the due process clause of

the Fourteenth Amendment to the United States Constitution. It is also maintained that the act violates the right of free speech guaranteed by the First Amendment to the United States Constitution, and article 1, sec. 7, of the Pennsylvania Constitution, guaranteeing freedom of the press. Upon these theories defendants have moved in arrest of judgment and this is what brings the matter to my attention at this time.

Section 415 of The Penal Code, under which this prosecution was had, is virtually identical with the provisions of section 1846 of the Pennsylvania Election Code of June 3, 1937, P. L. 1333, 25 PS §3546, and provides as follows:

"Whoever writes, prints, posts or distributes, or causes to be written, printed, posted or distributed, a circular or poster, cartoon or other written or printed paper, designed or tending to injure or defeat any candidate for nomination or election to public office, by reflecting upon his personal character or political actions, unless the same is published in a newspaper avowedly responsible therefor, or unless there appears upon such circular, poster or paper, in a conspicuous place, the names of at least two (2) officers of the political or other organization issuing the same, or the name of some duly registered elector with description of his election district, as responsible therefor, is guilty of a misdemeanor, and on conviction therof, shall be sentenced to pay a fine not exceeding five hundred dollars ($500), or to undergo imprisonment not exceeding one (1) year, or both.

"If the statements are untrue, the person so offending is also guilty of libel, and may be prosecuted in the civil or criminal courts, or both."

I shall first consider the question whether the act is so vague and indefinite as to violate the due process clause of the Fourteenth Amendment to the United States Constitution. It should be noted at the outset that

there can be no quarrel with the general principle that a statute which possesses the undesirable qualities mentioned above is unconstitutional upon the grounds mentioned: Hallmark Productions, Inc., v. Carroll, 384 Pa. 348. The question is, does the present statute fall within this type of legislation?

Defendants lean heavily upon the theory that this is a libel statute, that the statute deals with libel and that an election being a privileged occasion, there could be no conviction unless there is proof of malice or negligence as required by article 1, sec. 7, of the Pennsylvania Constitution. They contend that since the act permits a conviction regardless of malice, negligence or falsity, it is vague and uncertain in that it does not spell out the elements of libel. Under their theory, the condemned publication to be in violation of the statute must not only be anonymous, it must be maliciously libellous as well.

I am not persuaded that libel is the gravamen of the described offense, but for the purposes of discussion I shall consider the act in the light of defendants' contentions. Since the act deals with writings designed or tending to injure or defeat a candidate by reflecting upon his personal character or political actions, it cannot be denied that some of the aspects of libel are present. But bare libel is not the thing proscribed. That which the act forbids is an anonymous publication containing the material which the legislature deemed offensive. It is the anonymity of the publication which is forbidden and which is the essence of the offense: Commonwealth v. Evans, 156 Pa. Superior Ct., 321, 325. Criminal libel, as such, is preserved in the concluding paragraph of the disputed section, but this does not affect the interpretation of the main body thereof. The legislature may, if it sees fit, conclude that an anonymous writing which attacks a political candidate's personal character or political actions is so far malicious

or negligent as to be impossible of justification, and could not be excused by a jury upon any ground: Commonwealth v. Foley, 292 Pa. 277, 282.

Thus, there is no requirement that all of the elements of libel be spelled out in so many words. It is sufficient if the language used is capable of interpretation which reveals such essentials. Lack of precision is not itself offensive to the requirement of due process. The Constitution does not require impossible standards; all that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices: Roth v. United States, 354 U. S. 476, 491, 77 S. Ct. 1304, 1312. Viewed in this light it is apparent that there is nothing vague or indefinite about the act in question. There is no ambiguity or doubt but that the publication of an anonymous writing which has the described effect or tendency, is offensive to the act. The adverse effect created by the publication, together with its anonymity, if it is libel at all, is a species of that offense in which malice is conclusively presumed by virtue of the anonymity alone: Commonwealth v. Foley, supra.

Defendants, however, point to the words, "designed or tending to injure or defeat any candidate . . . by reflecting upon his personal character or political actions," and ascribe to such words indefiniteness and vagueness of such serious nature as to destroy the possibility of reasonable interpretation. They pose the question whether such expressions as, "the candidate drinks too much," is "a man about town," or, "likes his alcoholic beverages," would fall within the purview of the act. These expressions, they maintain, would obviously not be criminal, yet might, under the terms of the statute, be so constructed by a misguided jury. Ignoring the logical answer that any language which obviously does not offend the statute would never be

submitted to a jury, the problem whether certain words are libellous has historically been solved by the jury in English speaking jurisdictions. At the common law a libel was any writing, picture or the like which exposed another to public hatred, contempt or ridicule: Blackstone, Book 4, Ch. 11.

The Penal Code, supra, in section 412, 18 PS §4412, merely put the common law definition in statutory form. From the beginning of our jurisprudence to the present day, whether a writing tends to blacken the memory of one who is dead, or the reputation of one who is alive, thereby exposing him to public hatred, contempt or ridicule, has been a jury question. It has always been for the jury to say, after the court has determined that the language is capable of such interpretation, whether a writing has such tendency. So here, there is no more danger of a jury being misguided as to what is designed to injure or defeat a candidate by reflecting upon his personal character or political actions, than there is of a jury being misled as to what "blackens" the memory of one who is dead or the "reputation" of one who is alive. These are matters which must, perforce, be left to a reasonable construction by a reasonable jury; no nicety of language or principle of semantics can operate as an efficient substitute. The sole difference, therefore, in the operation of the present statute and the general libel act is the circumstance that in the former anonymity supplies malice and negligence, whereas in the latter, the question of malice is for the jury. It is a common experience that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system. But this does not make a statute unconstitutional. While there may be marginal cases in which it is difficult to determine the side of the line on which a particular factual situation falls, this is not sufficient reason to hold the lan-

guage too ambiguous to define a criminal offense: Roth v. United States, supra, p. 491-92, and footnote 30.

The next question is whether the statute is in violation of the First Amendment to the United States Constitution which guarantees freedom of speech. While this amendment originally applied only to the powers of the Federal government, when the Fourteenth Amendment was adopted the First Amendment became a definition of the liberties which a State could not abridge: Zorach v. Clauson, 343 U. S. 306. But the guarantee of freedom of the press is limited by the law of slander and libel: Caldwell v. Crowell-Collier Pub. Co., 161 F. 2d 333, 336 (Certiorari denied, 332 U. S. 766). Libellous utterances are not within the area of constitutionality protected speech: Roth v. United States, supra. Therefore, if, as defendants contend, this is a libel statute, there is no constitutional guarantee which protects defendants from prosecution, and the legislature was well within its right in enacting it.

It is not necessary to dwell at length upon the contention that the act impinges article 1, sec. 7, of the Pennsylvania Constitution. The Superior Court, in Commonwealth v. Evans, supra, decided that it does not violate that provision of the fundamental law. While it is sometime said with persuasion that stare decisis does not apply in constitutional matters*, it is settled that a lower court has no right to ignore the latest decision of the Superior Court on an issue which has been squarely decided. Until that decision should be overruled by the Supreme Court, it is still the law of the Commonwealth, regardless of any other court in the country, including the Federal courts, and this

---

* One obvious reason being that judges are sworn to uphold the Constitution and not the decisions of the appellate courts, and another being that the Constitution is the supreme law of the Commonwealth. See Heisler v. Thomas Colliery Co., 274 Pa. 448, 453.

applies to constitutional questions as well as to any other: Commonwealth v. Nelson, 172 Pa. Superior Ct., 125, 132, (Reversed on other grounds). In consequence, the Evans case firmly binds me to the conclusion that the act in question does not violate the Pennsylvania constitutional guarantee of freedom of the press.

Before leaving the problems presented by this case, something should be said concerning defendants' arguments as to the type of legislation with which we have been dealing, its aims and purposes. Defendants have earnestly advocated that the act is a subconsciously established protective device enacted by political legislators in self-defense; that the act not only protects weak and thin-skinned politicians, but interferes with the free exchange of thought during an election, thereby preventing the voting public from having access to valuable information upon which to base an intelligent exercise of franchise. In this respect defendants point out that there are many occasions when fear of reprisal would prevent a person having peculiar knowledge from expressing that which he knows to be fact; that if the writings are scurrilous and untrue, there are plenty of statutes which can be used to punish the offender. If, however, what is said in a publication, even though otherwise objectionable, is true, then the voters have every right to such information.

While the arguments thus advanced are plausible, I cannot accept them. I am persuaded that one of the burdens of public office is a qualified "open season" upon every phase of the officer's public and private life. To a still more qualified extent, the same burden rests upon one who would become a public official through the elective processes. But this is not a statute designed to protect either a candidate or a public officer. There may be an identical benefit conferred upon such persons by reason of the statute's operation, but this is not its true aim. Apart from the ancient justi-

fication for the libel laws which Blackstone says (Book 4, Ch. 11) were to prevent breaches of the peace because the publication might stir up the objects thereof to revenge and bloodshed, there is an even more laudable reason in the proscription of the present law. In the days when every man carried a weapon, and swashbucklers were wont to avenge their own wrongs, breaches of the peace were natural concomitants of a published libel, but the modern citizen is reasonably peaceful and not so apt to take matters into his own hands. The law which is now under consideration is based upon a much firmer and more sensible ground than the prevention of private violence. A pure and proper election is such a fundamentally important element in our governmental system that every precaution must be had to preserve its integrity and prevent abuse. Citizens are entitled, of course, to know all there is to know about political candidates; otherwise an election would become more of a lottery than an intelligent expression of selective opinion. But, can it be said that an anonymous publication is a proper or even a reasonably desirable informative device?

The very circumstance of anonymity suggests a lack of merit and truthfulness. If the public is to be apprised of charges against a candidate, it must also be aware of the source of such charges if there is to be any benefit derived therefrom. The estimate and regard or lack or regard in which a person responsible for a publication is held by the public is often as effective in determining the result of an election as the substance of what is contained in the circular concerning the candidate: State v. Freeman, 143 Kan. 315, 55 P. 2d 362, 365. There is much more danger to our form of government in the defeat of a qualified candidate through libellous and untrue statements, than there is in forbidding an irresponsible attack upon him by unknown persons who claim to exercise a right which is, at least,

a doubtful one. It is a reasonable assumption that all of these considerations were balanced and considered by the legislature which was acting clearly within its prerogatives when the act in question was passed.

While it is true that public elections do not always result in the choice of the better qualified candidate, this is inherent in a system which concedes to the electorate the right to select even the basest of men if it so chooses and to reject individuals of the highest calibre. But, in making the choice, it is also an inherent element in the elective process that nothing misleading, fraudulent or diverting interpose to obstruct the flow of proper information into public channels. This is the transcendent right of the American voter. In my view, one of the prime considerations prompting the appearance of this statute upon the books was to maintain, so far as possible, the public right to receive uncontaminated data upon which to base an intelligence preference.

An election won from ambush is no more proof of the respective merits of the candidate than is an athletic contest, won through dirty play, proof of the superiority of the successful contestant. The danger of private reprisal to one who would publish an anonymous attack upon a candidate must give way to the highly imperative rights of society. What is more, if an election is to be so debased and so vulgar as to admit of unethical and cowardly practices, if a candidate is to be placed in a glass house, unprotected from an unseen, unknown and vicious enemy who throws stones from behind an impenetrable barrier, from what source will we derive the material to man the important offices of the Commonwealth? Surely, no person of even normal sensibility will stand for public election if by so doing he will become a naked and helpless target for vicious and contumelious attacks by irresponsible blackguards. The public policy of the Commonwealth, implicit in the nature of its form of government, is to

attract the best material to public service, and any statute designed to effect such policy becomes at once a highly essential engine of the democratic process.

As said in State v. Freeman, supra, where a similar statute was under consideration by the Supreme Court of Kansas: "There is nothing in the statute which prevents in the slightest degree any person from exercising all his constitutional rights to write or print information concerning a candidate. The statute simply requires that the responsibility for posting or distributing such information be conspicuously indicated on the circular or poster employed. The statute is not a denial of liberty. It requires only the assumption of the responsibility of liberty."

And now, to wit, March 20, 1958, the rules heretofore granted at nos. 129, 130, 131 and 132, September sessions, 1957, to show cause why judgment should not be arrested, are discharged and defendants are directed to appear Monday, April 21, 1958, at 10 a.m., for sentence.