**CARROLL v. FLORIDA PUBLISHING CO., et al.**
No. 63-2073-L.
Circuit Court, Duval County.
September 23, 1964.

Carlton L. Welch, Jacksonville, for plaintiff.

Harold B. Wahl of Loftin & Wahl, Jacksonville, for defendant Florida Publishing Co.

Lacy Mahon, Jr. of Mahon & Stratford, Jacksonville, for defendant Stratton.

S. Perry Penland, Jacksonville, for defendants Wichman and Burwich, Inc.

TYRIE A. BOYER, Circuit Judge.

*Memorandum opinion*: This cause was heard on the numerous undisposed of pleadings filed herein, and in the cases which have been consolidated herewith, to-wit: case nos. 63-2074-L, 63-2075-L, 63-2076-L, 63-2077-L, 63-2263-L, and 64-51-L. The plaintiff was one of the officials of the now abolished city of Boulogne, Florida, and will hereinafter, for convenience and clarity, be referred to as "plaintiff". The city of Boulogne will be referred to as "Boulogne". The amended complaint designates two corporations and two individuals as defendants. The defendant, Harry C. Wichman, will be hereinafter referred to as "Wichman"; Burwich, Inc., as "Burwich"; Florida Publishing Company as "publisher" and Harry O. Stratton (State Senator from Nassau County) as "Senator" or "Stratton".

The amended complaint seeks to impose liability on the four defendants on the theory of conspiracy to injure, by "holding the officials of the said City of Boulogne, Florida, up to public scorn and ridicule" by the publication of alleged libelous statements regarding the Boulogne city officials.

Specifically, the alleged libelous and defamatory words complained of were contained in the January 9, 1963, issue of the Jacksonville Journal, viz—

"The Boulogne city officials have been making their living trapping tourists passing through their town ***".

A copy of the pertinent portion of the January 9, 1963, issue of the Jacksonville Journal is attached to, and made a part of, the amended complaint. It revals a "headline article" as follows—

BOULOGNE: "MONSTER THAT MUST BE DESTROYED"

By JACK WILLIAMS
Journal Staff Writer

He "created a monster" when he helped establish the Nassau County town of Boulogne and now he is determined to destroy it, State Sen. Harry Stratton of Callahan says. Stratton and Nassau Rep. Claude Wingate of Fernandina Beach said they will seek legislation in Tallahassee this spring taking away the city charter of the small town at the Florida-Georgia state line on U. S. 1 and 301.

> The town has 26 registered voters and 11 freeholders, and has been charged several times since its incorporation in 1955 with being a speed trap.
>
> "The Boulogne city officials have been making their living trapping tourists passing through their town, and this kind of thing is not what the people of Nassau County want," Stratton said.
>
> Stratton supported the incorporation of Boulogne in 1955.
>
> Stratton and Wingate said they will bring local bills to abolish the town before the 1963 session of the Florida legislature and before any special sessions which might be called before then.
>
> Passage of local bills supported by both a county's senator and representative is usually automatic. ***

There is presently pending before the court, in addition to several motions and objections of a technical nature, separate motions to dismiss filed by each of the four defendants and a motion for summary judgment filed by the defendant, Florida Publishing Company. Logically the motions to dismiss should first be considered and ruled upon.

As to the defendants, Wichman and Burwich, the amended complaint alleges that at all times material to this cause Wichman was "an officer, agent, and/or employee of the defendant, Burwich, Inc. *** and was acting within the course of said agency or employment, by or on behalf of said Burwich", and that Wichman "acting in the capacity aforesaid, *** individually and as an officer and agent of said Burwich, Inc., wilfully engaged in a wrongful and malicious conspiracy with one William E. Blankenship (not a defendant herein) and with divers others to engage in a program of concerted action to bring about public defamation and embarrassment upon the plaintiff as an official of the duly incorporated City of Boulogne". The amended complaint further alleges that the publisher "combined, confederated and joined" with Wichman and Blankenship by publishing certain articles in the Jacksonville Journal. There are other allegations that the various defendants "joined" and "confederated" "in holding the officials of said City of Boulogne, Florida, up to public scorn and ridicule". The specific statement contained in the publication complained of is attributed by the publisher to Senator Stratton. At no place in the complaint is it alleged that the specific publication complained of was an utterance of the defendant, Wichman, or that said defendant, Wichman, acting individually or on behalf of Burwich induced the Senator to make such statement, or the publisher to publish it.

Upon considering a motion to dismiss, the trial court is bound by the allegations of the complaint and for the purpose of the motion all allegations are deemed true; and the trial court may not make assumptions, except as to those things of which a court is entitled to take judicial notice, beyond the four corners of the complaint.

## Conspiracy

Conspiracy is generally defined as a combination of two or more persons to accomplish, by concerted action, some unlawful act or to accomplish by unlawful means some act not in itself unlawful. (6 Fla. Jur., Conspiracy, §2) To constitute conspiracy there must be an express or implied agreement or understanding between two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means; there must be an agreement, combination or confederation with a common design. (See 6 Fla. Jur., Conspiracy, §5) Just as use of the adverbs "wilful, wanton and malicious" will not so strengthen a complaint so as to warrant a complainant to recover punitive damages for a conversion (Anderson v. Burwell Motor Company, Fla. 73 So. 2d 822), so are the terms "wilfully engaged", "malicious conspiracy" "indifference to truth "confederated and joined", etc., equally impotent when used in a complaint seeking to state a cause of action for conspiracy. There can be no recovery based upon a conspiracy in the absence of allegations of general facts and circumstances constituting such. In other words, the mere fact that an individual has a grudge against, or a dislike for, another who is subsequently tortiously injured does not render such individual a conspirator, even though he may revel and rejoice in the knowledge of the injury. In the case at bar, assuming arguendo that the plaintiff was libeled by the publication complained of, the complaint is devoid of any allegations that the defendants, Wichman or Burwich, uttered the alleged libelous statements, procured their utterance or procured the publication thereof.

In the case of Loeb v. Geronemus, Fla. 66 So. 2d 241, the Florida case which appears to be more factually in point than any other discovered, the defendants were members or officers of a certain lodge; and were, as a group, alleged by the plaintiff to have "maliciously conspired together to compose and fabricate false accusations against the plaintiff" and to deprive him of membership in the lodge. It was further alleged that "pursuant to this scheme and conspiracy the defendants made, issued, initiated, authorized, published, distributed or circulated" certain "false, fraudulent, malicious and slanderous" statements. According to the reported opinion, the complaint further alleged that "one of the defendants, *at the direction of the others*, stated to the members of the press, for publication purposes", accusations against the plaintiff. (Italics added.) As hereinabove observed, and as a reading of the amended complaint will reveal, such are not the facts alleged in the case at bar. It is apparent therefore that the complaint fails to state a cause of action based on a conspiracy and there being no allegations that the defendants, Wichman or

Burwich, uttered or published the statements complained of, so as to render them liable for libel or slander in the absence of a conspiracy, the complaint must be dismissed as to those defendants.

The gist of a civil action for conspiracy is not the conspiracy itself but the civil wrong which is alleged to have been done pursuant to the conspiracy. (Phillips & Sons, Inc., v. Kilgore, 152 Fla. 578, 12 So. 2d 465; Loeb v. Geronemus, supra.) Therefore, whether the amended complaint in this case alleges facts sufficient to state a cause of action for conspiracy against the Senator and the publisher must be determined from the standpoint of whether the complaint states a cause of action for libel. (Loeb v. Geronemus, supra.) When, under the facts of the particular case, the libel relied upon is non-actionable, an action on the theory of conspiracy to so libel may not be maintained. (Robertson v. Industrial Ins. Co., Fla., 75 So. 2d 198; Hunter Lyon, Inc. v. Walker, 154 Fla. 61, 11 So. 2d 176; Loeb v. Geronemus, supra.)

## Libel

It is therefore necessary to determine whether or not the publication complained of was libelous and if so, whether it constituted actionable libel.

## Identifiable group

The plaintiff has devoted seven pages of his brief to the proposition that the "Boulogne city officials" are such an identifiable group as to render a libel against such group actionable. Any contention to the contrary is clearly without merit and no further discussion will here be devoted thereto.

## Definition

Libel is defined in 20 Fla. Jur., Libel and Slander, §2, as—

"a malicious publication by writing, printing, picture, effigy, sign, or otherwise than by mere speech, of matter which exposes any living person, or the memory of any deceased person, to hatred, contempt, ridicule, or obloquy, or which causes or tends to cause any person to be shunned or avoided, or which has a tendency to injure any person, corporation, or association in his or its business or occupation".

## Per se or per quod

Libel has been discotomized as "libel per se" and "libel per quod." Libel per se has been defined as—

"the *false* and *unprivileged* publication by letter, newspaper, or other form of writing, of unfounded statements or charges which exposes a person to hatred, distrust, contempt, ridicule

or obloquy, or which tend to cause such person to be avoided or which have a tendency to injure such person in his office, occupation, business, or employment, and which are such that in their natural and proximate consequences, will necessarily cause injury to the person concerned, in his personal, social, official or business relations of life, so that legal injury may be presumed or implied from the base fact of the publication itself". (Layne v. Tribune Co., Fla., 146 So. 234, 236.) (Italics added.)

It was stated in Caldwell v. Crowell-Collier Pub. Co., 161 F. 2d 333, (which case was adopted as the law of Florida in Abram v. Odham, Fla., 89 So. 2d 334) that—

"*** Imputation of a crime is not present. But it is enough, if the material or necessary result of the imputation is to hold one up to public hatred, contempt or ridicule, *** or to prejudice him in his profession, office, occupation or employment ***".

It is clear therefore, and this court holds, that the specific language complained of in the case at bar (unless privileged and true) constitutes libel per se. Both attorneys have devoted space in their briefs to a discussion of the meaning of "trapping tourists" or "speed traps". Whether or not the operation of a speed trap is a crime as suggested by the plaintiff or a devious pastime as suggested by the defendant publisher is immaterial: certainly the charge or imputation of maintaining a "speed trap" or of "trapping tourists" for a living is sufficient to hold the person so charged up to "public hatred, contempt or ridicule", particularly when the alleged trapping occurs in the very gateway to a state which relies as heavily as does Florida upon her tourist industry.

### Necessity of falsity

Caldwell v. Crowell-Collier Pub. Co., supra, defines libel as "a compound of written falsity and malicious publication". As stated above, libel per se was defined by the Florida Supreme Court in Layne v. Tribune Co., supra, as a "false and unprivileged publication ***". It is stated in 20 Fla. Jur., Libel and Slander, §51, that "falsity is an essential element of libel". To the same effect is Newell, Slander and Libel, 3rd Edition, §956.

A careful reading of the amended complaint reveals that though there are numerous inferences of falsity and the word "false" is used repeatedly, at no place is there an unequivocal allegation that the publication which constitutes the gravamen of the complaint is false. It is apparent therefore that inasmuch as this court is bound by the bare allegations of the complaint, and it appearing that falsity, an essential element of libel, is not alleged, the complaint, in its present form, fails to state a cause of action.

Should the complaint be dismissed because of the technical defect in the pleading of falsity, with permission to amend, the real issues would not be resolved; therefore this court will proceed to consider, not whether the complaint in its present form *does* state a cause of action for either conspiracy or libel, but whether a cause of action *can* be stated based upon the facts and circumstances revealed and suggested by the amended complaint.

It having been determined that the plaintiff is a member of an identifiable group, and it appearing without contradiction that the statement complained of was in fact published, and the court having held that the offending statement, if false and not privileged, constitutes libel per se, the next query is whether or not such statement was privileged.

### Privilege

Privileged publications are divided into two classes—"absolutely privileged", and "conditionally or qualifiedly privileged". (Coogler v. Rhodes, 38 Fla. 240, 21 So. 109) The term "absolute privilege" has reference to the words spoken or written in certain legislative and judicial proceedings. The case at bar involving neither, the offending statement was not "absolutely privileged". Then was it "qualifiedly privileged"?

"Where a person is so situated that it becomes right, in the interest of society that he should tell a third person certain facts, then, if he bona fide, and without malice, does tell them, it is a [qualified] privileged communication." (Townsh. Sland. & L. [4th Ed.] §209; Coogler v. Rhodes, supra.)

It is well established in the law of Florida that—

"The generally accepted rule is that 'public officials' or 'public men' are subject to fair comment." (White v. Fletcher, Fla. 90 So. 2d 129.)

White v. Fletcher, supra, also recognizes the principle that public men might reasonably be expected to feel "more keenly the duty to speak than would an ordinary citizen". It has been held in other jurisdictions that public officials have an "absolute" privilege to make statements to the press concerning their official duties and that the publisher of the statement has a like privilege. (See Montgomery v. City of Philadelphia, 392 Pa. 178, 140 A. 2d 100; Barr v. Mateo, 360 U.S. 564, 3 L. Ed. 2d 1434; and 53 C.J.S. 166, Libel and Slander, §103.)

It is stated in 20 Fla. Jur., Libel & Slander, §75, that—

"It is a well-settled rule that the communication of matters affecting the interest of the general public, if made in good faith, is conditionally privileged. ***".

In the Restatement of the Law of Torts, volume 3, §606, page 275, is found—

(1) Criticism of so much of another's activities as are matters of public concern is privileged if the criticism, *although defamatory,*

  (a)  Is upon

      (i)  a true or privileged statement of fact, or

      (ii)  upon facts otherwise known or available to the recipient as a member of the public, and

  (b)  represents the actual opinion of the critics, and

  (c)  is not made solely for the purpose of causing harm to the other.

(2) Criticism of the private conduct or character of another who is engaged in activities of public concern, insofar as his private conduct or character affects his public conduct, is privileged, if the criticism, although defamatory, complies with the requirements of Clauses (a), (b) and (c) of Sub-section (1) and in addition, is one which a man of reasonable intelligence and judgment might make.

Again, in 20 Fla. Jur., Libel and Slander, §62, it is said—"In the absence of malice, a publication may be qualifiedly privileged, *even though it is not true,* and notwithstanding the fact that it contains a charge of *crime.*" (Italics added.)

The parties have tacitly agreed that, in the absence of malice, the offending statement of the Senator and the publication thereof by the publisher was qualifiedly privileged. Accurately speaking, they have tacitly agreed that in the absence of malice said statement would be qualifiedly privileged and therefore non-actionable.

### *Malice*

It is clear that malice vitiates a privilege and renders actionable any publication which, but for malice, would be qualifiedly privileged and therefore non-actionable. (Loeb v. Geronemus, supra; White v. Fletcher, supra; Abram v. Odham, supra.)

"That which would otherwise be a qualifiedly privileged publication is not so if the publisher is actuated by malice" (Coogler v. Rhodes, supra 112.)

It is equally clear that the malice necessary to render an otherwise qualifiedly privileged statement actionable must be actual malice as distinguished from implied malice, and the fact that the statement is false does not make it actually malicious. (White v. Fletcher, supra.)

"*** if a communication was privileged, the presumption is that it was made without malice." (White v. Fletcher, supra, 131, citing Leonard v. Watson, 150 Fla. 503, 8 So. 2d 12.)

If a plaintiff fails to prove express malice he fails to overcome the presumption of lack of malice. (White v. Fletcher, supra.)

Not only is allegation and proof of actual malice essential to render actionable, a defamatory statement otherwise qualifiedly privileged, but the burden of proof is also changed. As stated in Abram v. Odham, supra, 336—

"It should first be noted that in cases of qualified privilege, 'the presumption which attends cases not so privileged of malice from the publication of libelous language does not prevail. *The burden of proof is changed,* and, *in order for the plaintiff to recover he is called upon affirmatively and expressly to show malice in the publisher*' ". (Italics added.)

\* \* \*

"If the uncontroverted facts are equally consistent with either the existence or non-existence of malice, there can be no recovery, for 'there is nothing to rebut the presumption which has arisen in favor of the defendant from the privileged publication' ".

Therefore the next point to be resolved is whether or not the facts pleaded and revealed are sufficient to negate the presumption of lack of malice which accompanies a qualifiedly privileged statement and publication.

A public official cannot recover damages for any statement of matters affecting his moral or other qualifications when made by an interested citizen, unless such statements were both *false* and *malicious*. (Coogler v. Rhodes, supra.)

"\*\*\* Express malice is malice in fact, as distinguished from implied malice, and in the law of libel and slander contemplates ill will, hostility, and an evil intention to defame and injure. It signifies a hostile state of mind and feeling." (20 Fla. Jur., Libel & Slander, §52.)

The plaintiff urges that the publisher's failure to publish a retraction pursuant to Florida Statute 770.02 upon receiving notice "of the falsity" of the offending statement, establishes "malice in fact" on the part of the publisher. Though it is unquestionably true that failure to retract may be evidence of malice where the publisher directly (as distinguished from indirectly by quoting another) comments upon the plaintiff (Metropolis Co. v. Croasdell, Fla. 199 So. 568), nevertheless it would not be such in instances where the publisher simply quotes a qualifiedly privileged statement made by another.

If a publisher were to be required, as urged by plaintiff, to retract, after publication, a published qualifiedly privileged statement made by another and quoted by the publisher, he will be

placed on the horns of an impossible dilemna: should the publisher fail to retract he will be subjected to a suit for damages by the person referred to in the statement: should he retract, then he will have published a public proclamation that the person who initially uttered the statement was incorrect or untruthful, thus subjecting himself to suit by the person who made the statement. To place the publisher of a newspaper in such an anomalous position would make a mockery of our heritage of freedom of the press. Mr. Justice O'Connell is said to have inquired, during the oral argument in Abram v. Odham, supra, "How could the Times-Union retract a statement admittedly made by the candidate?". Such query is worthy of much consideration.

This is not to say that a publisher may quote obviously slanderous statements with impunity (Cooley on Torts, vol. 1, §161; Harper & James, Law of Torts, vol. 1, §5.18), but only to suggest that the application of F.S. 770.02 is different as between a publication of the publisher's own statement and a publication of the statement of another. Such is the distinction between the case at bar and those cited by plaintiff, to-wit: Metropolis Co. v. Croasdell, supra, and Walsh v. Miami Herald Publishing Co., Fla., 80 So. 2d 669. In Croasdell the publisher stated in an article, which was not a quotation of the statement of another, that the plaintiff had been "cashiered" from his job. The Supreme Court of Florida held that the failure of the defendant to print a retraction after receipt of notice from the plaintiff, in that case, would be "some evidence of actual malice on the part of the defendant". In Walsh v. Miami Herald Publishing Co., supra, again the offending language was contained in an article written by a staff writer which was very derogatory of the plaintiff and which did not purport to be a quotation from another. In that case, too, the Supreme Court stated at page 671—

"*** The proper statutory procedure was followed by appellant in the instant case, but the appellee has elected not to retract, and must therefore stand upon the accuracy of *its* statements". (Italics added.)

In both Croasdell and Walsh the offending statements were the statements of the publisher and a retraction would have implied error on the part of the publisher only. In either of those cases, had the offending statements been quotations from statements of another, in order for the publisher to have retracted it would have been necessary to have implied that the person whose statement was quoted had spoken inaccurately. A publisher should not, by law, be placed in the anomalous position, of having to make a choice between two such equally perilous elections.

Plaintiff further seeks to distinguish the publication here involved from those recited in opinions holding adversely to plain-

tiff's position, (particularly Abram v. Odham, supra) on the ground that the statement in the case at bar was not made during a political speech but was instead an utterance made by a state senator directly to a news reporter. Such a distinction is not available: it is clear from the interrogatories, admissions and depositions in the file that the activities of the government of the city of Boulogne had been under close scrutiny by the Senator for many months. He had warned the city officials that if they didn't get their affairs in order the city would be abolished. He had attempted to abolish the city during a prior legislative session and had failed because of lack of cooperation of another state official. During his subsequent political campaign the abolition of the city of Boulogne was one of the campaign issues. All of such was of vital interest to the citizens of Nassau County and the entire state of Florida. Therefore, when it became apparent at a meeting of the city officials attended by the Senator that they were still at odds, the statements made by the Senator following the meeting were of rightful and legitimate interest to the citizens of the state and the publisher was entitled to make the statements available for public consideration. In White v. Fletcher, supra, the offending statement was made by the defendant, chairman of the civil service board, not during a board meeting, but directly to a newspaper reporter. In his defense, the defendant relied, inter alia, upon his duty to express the sentiments of his office to the public. The Supreme Court of Florida affirmed a summary judgment for the defendant, commenting—

"The fact that he was a member of the board of civil service certainly gives added weight to his contention of lack of malice; as a member of the board he would have felt more keenly the duty to speak than would an ordinary citizen." (p. 131)

Certainly, Senator Stratton, having been instrumental in creating the city of Boulogne, should have felt a duty to his constituents, and to the state at large, to speak out on any subject affecting their interest.

No facts have been alleged in the complaint to negate the presumption of lack of malice; therefore for that additional reason, the complaint fails to state a cause of action against Stratton or the publisher.

*Summary judgment*

As before stated, the publisher has filed a motion for summary judgment. As has been hereinabove discussed, the complaint in this case fails to allege a conspiracy and is equally deficient in alleging a cause of action for libel for two reasons: first, there is no direct unequivocal allegation that the offending statement was false; and, second, there are no facts or circumstances

pleaded to rebut the presumption of lack of actual malice. Under such circumstances the complaint would customarily be dismissed with right to amend and the other undisposed of pleadings would thereupon become moot. However, though the complaint is technically defective, it does "inform the defendant of the nature of the cause against him" (Rule 1.8(b), 1954 Rules of Civil Procedure) and therefore raises the issues sufficiently for consideration of the publisher's motion for summary judgment. In considering that motion it will be assumed that conspiracy, falsity and malice are properly pleaded and raised by the complaint.

The query therefore is whether the pleadings, depositions and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact. (Rule 1.36(c), 1954 Rules of Civil Procedure) It appears established and without contradiction that the publisher published the statement complained of and that it failed to retract upon receiving plaintiff's notice pursuant to chapter 770, Florida Statutes. It is equally clear that the statement complained of was made initially by Senator Stratton to the publisher's reporter incident to a political controversy in which all of Nassau County, and in fact, the state of Florida, had an interest. Assuming arguendo that the statement was false, it was, as hereinabove held, qualifiedly privileged. If the communication was privileged the presumption is that it was made without malice. If the plaintiff fails to demonstrate express malice such presumption is not overcome. (White v. Fletcher, supra) This court is aware that when moving for summary judgment ordinarily the burden of demonstrating the absence of material fact is upon the movant and that there is no burden upon the opposing party. But if there is no evidence nor inference of an essential fact and if the evidence thereon is to the contrary, that burden has been met. Here, the file, including the deposition of the plaintiff, fails to suggest one iota of malice and the defendant's affidavits unequivocally negate any.

That Stratton made the statement attributed to him by the publisher is not subject to doubt. On July 14, 1964, his deposition was taken by the plaintiff. That deposition reveals, inter alia, the following—

Did you in January of 1961 know who the officials of the City of Boulogne were? — Yes, sir.

\* \* \*

I believe it is said that on January 9, you made a statement that the Boulogne city officials have been making their living trapping tourists passing through their town? — Yes, sir.

Did you make that statement? — Yes, sir.

Tell us what the circumstances were of your making it? — At the request of the citizens in the county and political issues. \* \* \* What you see in the article, if it is there, I said it.

A statement found in Abram v. Odham, supra, is peculiarly applicable to the case at bar, to-wit—

"*** nor has plaintiff hypothesized any motive for the publication of the news story even remotely suggesting that this defendant was using its qualified privilege as a mask for accomplishing some malicious purpose of its own."

\*　　\*　　\*

"*** no extrinsic circumstances have been suggested nor can be conceived—that would tend to show malice, in fact, on the part of this defendant; ***" (page 337)

The uncontradicted evidence reveals that the editorial writers and reporters did not even know the plaintiff. The statement by Stratton was on a subject of intense public interest and pertained to a political issue and a campaign pledge to abolish Boulogne. Far from there being any "motivation of personal spite or ill will" as alleged, plaintiff frankly concedes that he never had any unpleasantness or difficulties with the publisher or its employees. Not only is the file devoid of any evidence tending to prove malice on the part of the publisher, it is also devoid of any evidence of malice on the part of Stratton. Therefore, even if legally permissible, there is no malice on the part of the speaker to be visited upon the publisher. The plaintiff having failed to demonstrate malice on the part of the publisher and the pleadings, depositions and affidavits having specifically negated same, it is apparent that the publisher's motion for summary judgment must be granted. There having been no such motion filed by the other defendants, such may not be considered with reference to them.

### Opinion from facts assumed true

In passing, this court is constrained, without intending to decide whether or not the charge of operating a speed trap was true, to gratuitously observe that there appears to have been some basis for such an opinion.

According to the plaintiff, (plaintiff's memorandum, page 7) the city of Boulogne has been variously described "as 'a little more than a mile of highway', with one city limit which 'went only 500 feet west of the main highway—following a dirt road in a straight line—eastern limit followed Pigeon Creek in a semicircle and was as much as a half mile from the highway'."

Elsewhere in the file, including Stratton's deposition, it is revealed that Boulogne had nine freeholders, eight of whom were city officials. (The article in which the offending statement was contained states that there were 11 freeholders)

According to the exhibits attached to the answers to interrogatories filed herein by plaintiff on April 10, 1964, the following table reflects the relationship between the total revenue of the city of Boulogne, the portion derived from fines and forfeitures, and the amount spent for salaries during the years indicated—

| Year | Total Revenue | Fines & Forfeitures | Salaries |
|------|--------------|---------------------|----------|
| 1955-56 | $23,564.32 | $20,511.63 | $ 8,096.72 |
| 1956-57 | 30,386.41 | 17,331.00 | 10,182.24 |
| 1957-58 | 30,450.39 | 13,526.50 | 10,117.50 |
| 1958-59 | 39,846.89 | 21,067.00 | 9,955.76 |
| 1959-60 | 36,033.54 | 13,925.00 | 10,585.53 |
| 1960-61 | 36,765.30 | 21,718.00 | 11,035.69 |
| 1961-62 | 43,121.82 | 30,465.00 | 13,672.05 |
| 1962-63 | 17,804.79 | 9,644.00 | 6,111.29 |

Upon considering those figures and giving due consideration to the many complaints which Stratton stated in his sworn deposition that he received regarding the operation of the city police force, it can hardly be said that he was necessarily speaking rashly when he made the statement which has given rise to this controversy.

"*** an opinion or inference from facts assumed to be true [are] immune from liability for defamation." (White v. Fletcher, supra, 131, citing 53 C.J.S., Libel and Slander, §131(3).)

"Evidence of 'general suspicion and belief of the truth of the published charges *** is admissible, as pertinent to the question of express malice'." (White v. Fletcher, supra, citing Montgomery v. Knox, 23 Fla. 595, 3 So. 211, and Coogler v. Rhodes, supra.)

### New York Times v. Sullivan

The recent decision of the Supreme Court of the United States, New York Times Co. v. Sullivan, 11 L. Ed. 2d 686, has not been overlooked by the writer of this memorandum opinion; but reference thereto has been deliberately omitted in arriving at the decisions implicit herein.

The Sullivan case adds nothing to the jurisprudence of slander and libel so far as Florida is concerned. As stated by Mr. Justice Goldberg, in his special concurring opinion—

"The Court today announces a constitutional standard which prohibits 'a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not' ".

Notwithstanding the prolixity of the opinion, the holding thereof is embodied in the above quotation—such was long ago announced as the law of this state by the Supreme Court of Florida (Coogler v. Rhodes, supra, White v. Fletcher, supra) except that the Florida decisions were firmly based upon the law rather than upon a strained interpretation of the federal constitution.

### Applicability to other consolidated cases

As hereinabove recited, six other cases have been consolidated with this case, and the contents of this memorandum opinion is intended to apply with equal force to each of those cases.

An appropriate order, dismissing the complaint, with permission to amend, as to all defendants except Florida Publishing Co., will be entered forthwith, and as to that defendant a summary judgment will be entered against the plaintiff.